IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

HD

Rcv'd by:_____

| | | |
|---|---|---|
| KATIE MERKLE | * | |
| | * | |
| Plaintiff, | * | Civil Action No. SAG 2 5 CV 3 7 3 7 |
| | * | |
| USDC- BALTIMORE vs. | * | |
| '25 NOV 14 AM 9:07 | * | |
| MEDTRONIC, INC., | * | |
| | * | |
| Defendant. | * | JURY TRIAL DEMAND |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF,
## AND DECLARATORY RELIEF

## I.    PRELIMINARY STATEMENT

This action arises from permanent neurological injury caused by a deep brain stimulation system marketed as "reversible" and "removable." Defendant knew, or should have known, that its component materials could degrade in vivo, release biologically active compounds, and cause irreversible harm.

The device was implanted under FDA's Humanitarian Device Exemption (HDE) for rare conditions and within its pediatric oversight framework—regulatory pathways designed to protect vulnerable patients expected to live for decades with implanted materials. Federal law required Institutional Review Board (IRB) approval before implantation, an ethical safeguard rooted in the post-Nuremberg principle that no person should face investigational risk without independent review. Yet no record of IRB approval for Plaintiff's surgery has ever been found, and on information and belief, none exists.

1 of 104

The FDA's Pediatric Advisory Committee necessarily relies on manufacturer-submitted coding, which may not always distinguish between issues such as insulation breakdown, corrosion, or material degradation. As a result, the Committee's oversight may reflect only part of the underlying failure patterns.

Plaintiff entered surgery believing the device had undergone the same rigorous safety testing required for other Class III implants. Critical risks—including material degradation, toxic byproducts, and the impossibility of safe removal—were never disclosed. Under Maryland law, consent obtained without disclosure of material risks is not valid, and risks concealed cannot be deemed assumed.

In 2022, partial explant surgery confirmed that at least one intracranial lead had disintegrated, leaving fragments embedded in cortical tissue and bone. Another lead remains implanted, cannot be removed or monitored, and renders MRI permanently contraindicated. The retained fragments cannot be safely removed and remain a continuing source of medical concern, carrying plausible risks of chronic inflammation, progressive neurological decline, systemic toxicity, and reproductive harm. FDA's own adverse-event records describe similar cases of retained fragments and coating breakdown—outcomes the Defendant internally characterized as "expected over time."

Plaintiff's claims arise under Maryland law imposing duties to warn, to update labeling, to secure informed consent, and to avoid misleading statements—duties that run parallel to federal obligations under 21 C.F.R. §§ 801.6, 803.50, 814.84, and 814.124. Defendant breached each of these duties by inducing Plaintiff's consent with assurances that the system was reversible and suitable for long-term implantation, when in fact its durability and biocompatibility had never been validated.

This action is brought not only to obtain redress for the injuries sustained but also to highlight systemic failures in disclosure and oversight. It seeks compensatory, statutory, punitive, and equitable relief, and reinforces the principle that medical innovation cannot come at the expense of candor, oversight, and the right to make an informed medical choice.

## II.    PRO SE STATUS AND ASSISTANCE

This Complaint is the product of extensive independent research, aided by accessibility tools, AI-assisted legal resources, and informal consultation with knowledgeable individuals. It reflects the coordinated effort of friends, family, caregivers, and advocates to overcome Plaintiff's limitations and the absence of institutional support. Every available resource has been used to present the factual record and legal claims as clearly and completely as possible. It stands as both a legal pleading and a forensic record of harm—assembled without counsel, litigation infrastructure, or institutional privilege—and as both a mother's attempt to protect her child and a citizen's demand for accountability.

Plaintiff respectfully asks the Court to construe this filing with the latitude afforded to pro se litigants. Because of documented deficits in memory, executive function, and language processing, she relied on multiple supports to organize and present complex medical and legal issues. The coherence of this filing should not be mistaken for absence of injury; it is the product of extraordinary effort simply to be heard.

Plaintiff did not elect to proceed without counsel. This Complaint reflects sustained self-advocacy after repeated but unsuccessful efforts to secure representation. Multiple attorneys acknowledged the seriousness of the facts but declined engagement because of the unprecedented convergence of personal injury, medical device regulation, toxicological and

reproductive harm, informed medical choice, and constitutional rights to bodily integrity and reproductive autonomy—issues rarely, if ever, combined within a single action.

This record exists as much for Plaintiff's daughter as for this Court: a forensic, medical, and moral account of what was hidden, what was denied, and what must not be repeated. It maps failures—regulatory, clinical, corporate, and human—and offers a blueprint for transparency and the preservation of autonomy. It is also a call to affirm that the rights endangered here are fundamental, and that their protection is a duty the law cannot abdicate.

## III.   **PARTIES**

1.    Plaintiff, Katie Merkle (hereinafter "Plaintiff") is a resident of 706 Hunting Place, Baltimore, MD 21229 and was at all relevant times a patient implanted with the Medtronic Activa Deep Brain Stimulation (DBS) system (hereinafter the "DBS device").

2.    Defendant Medtronic, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business located at 710 Medtronic Parkway NE, Minneapolis, Minnesota 55432-5604. Medtronic conducts business throughout the United States, including Maryland, and may be served through its registered agent, CSC – Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

3.    At all times relevant, Defendant was engaged in the business of placing medical devices into the stream of commerce, including the DBS device, by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, distributing, and/or selling such devices throughout the United States and specifically within Maryland.

4.      Plaintiff was implanted with a Medtronic DBS device and, as alleged herein, suffered severe and permanent injuries arising from its design, manufacture, labeling, marketing, and promotion.

5.      Defendant is liable for Plaintiff's injuries and damages by virtue of its role in designing, manufacturing, distributing, and selling the DBS device, and is further vicariously liable for the acts and omissions of its employees, agents, and representatives, who at all relevant times acted within the scope of their employment or agency.

## IV.    JURISDICTION AND VENUE

6.      Plaintiff incorporates by reference all preceding paragraph

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. This Court also has personal jurisdiction over Defendant because it conducts substantial business in Maryland, has committed tortious acts within the State, and has caused injury to Plaintiff in this State arising from its business activities. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## V.    MEDICAL BACKGROUND AND DEVICE OVERVIEW

### A. Implant Context and Consent Failures

8.      Dystonia is a neurological movement disorder characterized by involuntary muscle contractions, repetitive twisting movements, and abnormal postures. It primarily arises from dysfunction within the basal ganglia—deep brain structures responsible for regulating motor control. In its primary form, dystonia is classified as a non-degenerative

condition, meaning it does not cause progressive loss of brain tissue or ongoing neurological decline.

9.      For treatment context, the FDA's Humanitarian Device Exemption H020007 authorizes deep brain stimulation of the GPi or STN for chronic, intractable primary dystonia, including generalized/segmental, hemidystonia, and cervical dystonia in patients seven years of age and older.

10.     Plaintiff was diagnosed with Myoclonus-Dystonia (DYT11) as a child—a genetic subtype that primarily affects movement and is maternally imprinted when inherited, meaning that a child cannot inherit the active form of the disease from its mother. DYT11 has its own unique etiology, clinical trajectory, and treatment considerations.

11.     Dystonia itself is a condition marked by unstable motor pathways that are highly sensitive to stress. Scientific literature has long recognized that oxidative stress and inflammation can aggravate dystonia syndromes of every kind. That means the risks of implanting degradable hardware in these patients were foreseeable.

**B. Device Overview: Structure, Function, and Material Composition**

12.     The Deep Brain Stimulation (DBS) system implanted in Plaintiff comprised three primary components: (1) an intracranial electrode lead (Model 3387), (2) a subcutaneous extension wire, and (3) an implantable pulse generator (IPG) placed in the chest wall. Under routine conditions, the IPG is designed to be replaced periodically as its battery life expires. The implantable pulse generator delivers controlled electrical stimulation through these leads, based on parameters set by physicians using a clinical programmer. Patients are issued an external controller to monitor basic system function and on–off status.

13.     The Model 3387 lead includes four platinum–iridium electrode contacts embedded within a polyurethane (Pellethane 80A) body and insulated with a fluoropolymer sheath. The subcutaneous extension wire contains similar materials and is exposed to mechanical stress, thermal cycling, and prolonged physiological exposure over time.

14.     Deep brain stimulation (DBS) systems are engineered so that electrical current exits only through the small contact points at the tip of each lead, while the remainder is encased in insulation to prevent spread into healthy brain tissue. When that insulation breaks down, that safety principle collapses.

15.     Explant studies have documented cracks and degradation in DBS lead insulation, and similar failure modes have long been recognized in cardiac pacing and defibrillator systems, where insulation breakdown and conductor failure led to current leakage and multiple recalls, including Defendant's Sprint Fidelis lead. Once a conductor is exposed, current follows the path of least resistance: it can leak into surrounding fluid and tissue rather than remaining confined to the intended target. The result is twofold: less therapeutic stimulation reaches its site, and stray current spreads unpredictably into other structures. In effect, insulation failure transforms a focused therapy into an uncontrolled electrical source, an outcome well recognized from decades of implantable lead experience.

16.     Defendants DBS device was promoted as a "reversible" and "removable" alternative to ablative neurosurgical procedures such as thalamotomy and pallidotomy, which the HDE Summary itself described as "irreversible, destructive procedures…associated with disabling complications." Defendant further marketed the system as programmable, compatible with long-term care, and preserving "future therapy options." Taken together,

these representations conveyed a powerful impression of safety and reversibility—an

impression never substantiated by long-term testing and inconsistent with information

available to Defendant from its prior device history.

## C. Material Composition and Degradation Risks

17.    Scientific literature, FDA regulatory records, and Defendant's own internal data establish

that the materials used in the DBS device are chemically unstable under conditions of

chronic implantation and electrical stimulation.

18.    As early as the 1980s and 1990s, safety alerts were issued for Defendant's polyurethane-

insulated cardiac pacing leads (including Models 4002, 4012, 6972, and 6991U), with

multiple studies finding insulation failure rates to be "unacceptable" in certain models. In

2007, Defendant recalled more than 30,000 Sprint Fidelis defibrillator leads after

postmarket data confirmed premature failure, driven primarily by conductor fractures and

durability issues in leads insulated with Pellethane 55D. These events placed Defendant

on notice that Pellethane chemistry was susceptible to in-vivo oxidative breakdown. On

information and belief, Defendant nevertheless continued to use Pellethane 80A in its

DBS leads—another variant from the same chemical family—without providing Plaintiff

and her providers with any warning that the material carried similar, foreseeable

degradation risks.

19.    Publicly searchable internal manufacturer documents acknowledge that at least some of

the DBS lead materials include—or degrade into—at least four chemicals of concern: (1)

two polyurethane breakdown products shown to be neurotoxic in animal models, (2) a

known animal carcinogen, and (3) an organotin compound recognized internationally as a

neurotoxin. The same documents admit that the quantities released over time are

unknown and concede that, while polyurethane had been used in cardiac devices, these materials "have not been previously implanted in the brain."

20.    Polyurethane degradation can yield 4,4′-methylenedianiline (MDA). The International Agency for Research on Cancer (IARC)—the World Health Organization's specialized cancer research arm—classifies MDA as a Group 2B possible human carcinogen. The U.S. National Toxicology Program (NTP)—an interagency program of the Department of Health and Human Services—lists MDA as reasonably anticipated to be a human carcinogen, with documented neurotoxic and hepatotoxic effects.

21.    Studies of similar medical-grade polyurethanes have also identified organotin compounds, including dibutyltin, used as stabilizers or catalysts. These are recognized by the World Health Organization (WHO, International Programme on Chemical Safety) and the United Nations Environment Programme (UNEP) as reproductive toxicants, endocrine disruptors, and neurotoxicants (WHO/IPCS, Concise International Chemical Assessment Document No. 14, Dibutyltin Compounds; UNEP Global Chemicals Outlook, 2019).

22.    Other components of the DBS lead presented equally foreseeable hazards that were not disclosed. The fluoropolymer insulation layers—believed to include PTFE, PFA, or related perfluorinated compounds—are marketed as inert when intact but are susceptible in active implants to interface delamination and layer fragmentation. These electrochemical failure modes at electrode/insulation junctions create pathways for particle release. Fluoropolymers are classified by international regulators as polymeric PFAS, and the PFAS class is subject to global controls because of their extreme persistence and bioaccumulation potential. Numerous studies confirm that PFAS cross the

placenta, and meta-analyses show substantial transplacental transfer, with PFAS also detected in human brain tissue and demonstrated to penetrate the blood–brain barrier—all reinforcing concern for fetal and neural exposure. The U.S. EPA's 2024 national PFAS rule underscores the public-health significance of these substances and their lasting presence once released into the body. Defendant's own PMA filings did not address fluoropolymer particulate release or platinum ion diffusion, and the quantities of such materials remain unknown.

23.    The platinum–iridium contacts of the lead present parallel risks. At the electrode–tissue interface, constant electrical reactions can shift the local environment toward acidity or alkalinity, conditions that accelerate slow corrosion of the alloy. This process releases platinum ions and micro-particulates into adjacent neural structures. These byproducts have been shown to activate microglia, trigger inflammatory cascades, and inflict oxidative and structural stress on surrounding neurons.

24.    Taken together, polyurethane breakdown, fluoropolymer delamination, and platinum corrosion reflect a convergence of possible failure modes that were scientifically foreseeable, but never quantified, monitored, or disclosed. These omissions, corroborated by toxicological literature, extractables data presumably submitted under PMA P960009, and FDA MAUDE adverse event reports, support the inference that Defendant knowingly placed Plaintiff at risk of cumulative, unstudied, and undisclosed exposure.

25.    On information and belief, an exhaustive review of every publicly accessible scientific database, peer-reviewed journal, regulatory docket, and FDA record reveals no validated toxicological thresholds for any degradation byproducts of this system within neural, glial, or reproductive tissue. No publication, manufacturer submission, or agency filing

has established safe exposure limits or clearance mechanisms for the chemical species known to emerge from long-term implantation, including polyurethane breakdown intermediates, fluoropolymer particulates, or soluble platinum compounds. Despite more than two decades of clinical use, there is no record of any long-term in vivo neurotoxicity or reproductive safety study examining these materials under realistic intracranial conditions of electrical stimulation, heat, and chronic inflammation.

26.    The first documented regulatory request for a neurotoxicity or carcinogenicity study did not appear until a 2008 post-approval order—over a decade after the original Parkinson's PMA (1997) and five years after the dystonia HDE (2003)—suggesting that initial market authorization proceeded without any comprehensive evaluation of chronic intracranial biostability. Independent scientific reviews now concede that while short-term *in vitro* cell-culture tests reported no immediate cytotoxicity, those assays were limited to hours or days of exposure and cannot model the slow degradation or ion release that occurs over years within living brain tissue. As summarized in contemporary analyses, the apparent absence of overt toxicity in clinical reports does not establish actual safety; it more accurately reflects a total absence of long-term measurement.

27.    In practical terms, the existing scientific record shows a twenty-five-year gap between widespread human implantation and any systematic effort to quantify chemical release, accumulation, or neuroinflammatory sequelae. Whether the required long-term toxicology studies were never performed, performed but withheld, or conducted under non-public contractual terms remains a material factual dispute that can only be resolved through discovery.

28.  Because degraded fragments and their byproducts plausibly remain embedded and unretrieved, Plaintiff continues to experience ongoing exposure and injury that cannot be monitored.

29.  More recent manufacturer labeling for the Defendant's B33005/B33015 SenSight directional leads indicates an expected implant lifetime of approximately five years, and identifies polyurethane and platinum-iridium as the materials to which patients may be exposed. These leads were approved by the U.S. Food and Drug Administration on or around May 2021, as part of a PMA supplement (P960009/S391) for the SenSight Directional Lead System. This disclosure suggests that the manufacturer may have more recently recognized a finite service life for similar materials, and/or that breakdown or functional decline over time is foreseeable. At the time of Plaintiff's surgery, no comparable disclosure was made. Instead, Plaintiff and her providers were led to believe the system could remain safely in place.

**D. Regulatory Status of HDE**

30.  In 2005, Plaintiff was implanted with Defendant's Activa DBS device using the Model 3387 lead. At that time, the system carried Premarket Approval (PMA P960009) for Parkinson's disease, but for dystonia it had only been authorized under a Humanitarian Device Exemption (HDE H020007). The HDE pathway permits marketing for rare conditions based on "probable benefit," without proof of long-term effectiveness or validation of material durability.

31.  Defendant knew from prior experience with other implantable leads that polyurethane insulation was susceptible to in-vivo degradation, and its own filings reflected the absence of long-term safety testing. Yet public-facing materials emphasized reversibility,

removability, and adaptability, giving patients the impression that the only uncertainty was therapeutic benefit rather than material safety.

## E. Investigational Use and Failure to Disclose

32. Because the device was implanted under an HDE, federal law required Institutional Review Board (IRB) oversight as an added safeguard. No record of IRB approval for Plaintiff's surgery has been identified. As a result, on information and belief, she received neither the validation of a PMA-approved device nor the substitute protections Congress intended through independent review.

33. At the time of implantation, Defendant already had notice—from prior failures, toxicological literature, and its own regulatory filings—that the polyurethane insulation and metal components were prone to breakdown in the body. Nonetheless, Defendant's marketing continued to emphasize reversibility and preservation of future treatment options, while omitting that the device remained investigational, that long-term safety had not been validated, and that degradation was a foreseeable hazard. Plaintiff and, on information and belief, her physicians were left with incomplete and misleading information about the true risks of implantation.

## VI.    FACTUAL ALLEGATIONS

### A. Defendant's Prior Knowledge and Concealment of Device Risks

#### 1. Material Composition, Known Risks, and Omitted Disclosures

34. The DBS device implanted in Plaintiff incorporated Pellethane 80A polyurethane insulation, fluoropolymer sheathing, and platinum–iridium electrodes. As stated in the Material Composition section above, each of these components is prone to degradation under physiological conditions, releasing biologically active compounds.

35. Byproducts from material breakdown can plausibly provoke chronic neuroinflammation —sustained microglial activation, oxidative stress, and inflammatory signaling that can injure neurons, disrupt cortical and subcortical circuits, and can drive measurable cognitive and motor decline. Defendant never disclosed this foreseeable outcome, leaving Plaintiff and, on information and belief, her physicians, without the information needed to recognize, monitor, or mitigate these risks.

36. Defendant's own patents and technical reports acknowledged the relevant in-vivo degradation pathways, conceded they could not be replicated in short-term bench testing, and confirmed no long-term neural biocompatibility studies had been conducted; internal records identified at least four toxicologically active compounds released during breakdown, while admitting the amounts released over time were "unknown."

37. Despite this knowledge, Defendant's marketing materials continued to portray the system as safe for chronic use, highlighting its programmability, its ability to be removed if necessary and to preserve "future therapy options." Nowhere did these materials disclose that the insulation could chemically degrade, fragment irretrievably, obstruct MRI, or release compounds with systemic and/or reproductive risks. The failure to disclose this deprived Plaintiff and, on information and belief, her providers of the information necessary to evaluate the full scope of foreseeable harm.

**2. Split Disclosure of Risks**

38. Defendant's warnings about breakdown and toxicant release appeared in fragmented and inconsistent ways, without actionable information at the time consent was required. Public-facing brochures and websites described the system as "reversible" and "removable," emphasizing flexibility and safety, while omitting the fact that leads could

degrade in vivo, fall apart, fuse to tissue, or release biologically active compounds. This selective framing shaped Plaintiff's understanding and left her with no reason to believe the implant could disintegrate or permanently foreclose diagnostic imaging.

39.    Publicly accessible physician-facing materials were also limited. The installation manual cautioned: *"The polyurethane tubing of the lead may release neurotoxic or carcinogenic compounds. Data are insufficient to assess the likelihood of these effects occurring in patients who receive the device."* This phrasing raised abstract toxicological concerns but did not clearly explain that the insulation itself could degrade over time in the body, adhere to tissue, complicate removal, contribute to neurological injury, or preclude MRI. The manual then added that *"each material composing the DBS Lead has been selected for biocompatibility through laboratory testing, animal testing, and clinical experience,"* and emphasized that the lead and its accessories were *"intended for single use only."* In practice, physicians appeared to be presented with general reassurances of material safety alongside limited caveats, without a plain acknowledgment that physical deterioration of the lead was a foreseeable failure mode.

40.    Defendant's technical implant manuals advised physicians to show patients the hardware before surgery, but also directed: *"After the Activa System is implanted, advise the patient or caregiver to read the Activa Therapy patient manual for dystonia. The Activa Therapy patient manual for dystonia is included in the envelope in the kit package."* By structuring disclosures this way, the only written references to breakdown were postponed until after surgery.

41.    In practice, access was further obstructed by the packaging itself. On information and belief, the original patient manual was enclosed in a sealed kit with the implantable pulse

generator (IPG), intended to be opened only in the operating room to preserve sterility. The outer packaging warned: *"Medtronic will not consider this product for restock or credit if this label is broken or removed."* Because each kit presumably cost thousands of dollars, hospitals would plausibly have a strong financial disincentive to open it early; if a patient declined implantation, the opened kit could not be returned. The seal also functioned as assurance of sterility and authenticity. These conditions would have likely made it impracticable for physicians to access the enclosed patient manual before surgery.

42.     On information and belief, the problem was compounded by the two-stage surgical process. Plaintiff first underwent placement of intracranial leads, then returned weeks later for implantation of the neurostimulators (packaged with the sealed manuals). By the time the patient manual was physically available, Plaintiff had already committed to the first and most irreversible stage of the procedure.

43.     Even then, the warnings were inconsistent and buried. The patient manual began with *"Welcome to the Medtronic family"* and included both a patient section and a prescribing section for physicians. Buried in fine print in the patient section stated: *"Over time there is some risk that the lead could break down. If this would happen the breakdown materials are known to cause nerve damage or cancer in animals. The chance of these effects occurring in patients is not yet known."* By contrast, the physician section stated that *"the polyurethane tubing of the lead may release neurotoxic or carcinogenic compounds"* and that *"data are insufficient to state the likelihood of these effects."* It made no mention that the risks of degradation or its sequelae.

44.     Even if the manual contained a line somewhere in its 146 pages stating that the lead "may break down," this was not a meaningful disclosure. The document itself was a small,

technical booklet, dense with instructions, and typically only accessed, if at all, after the device had already been implanted. Plaintiff did not encounter this statement until nearly twenty years later. At the time of her surgery, and the years following, she reasonably relied on her providers' guidance and on the public assurances that emphasized stability and reversibility. A buried technical caveat, delivered after implantation, could not substitute for a clear warning provided up front—at a moment when the information might actually inform the decision whether to undergo the procedure.

### 3. Defendant-Authored Publication Confirming Foreseeable Degradation

45.    In 2020, Defendant's materials scientists published a peer-reviewed article in *ACS Macro Letters* titled *Longevity Expectations for Polymers in Medical Devices Demand New Approaches to Evaluating Their Biostability* (ACS Macro Lett. 2020, 9, 1793–1798). The paper addressed long-term degradation of polyurethane and other polymers in permanent implantable devices—including neurostimulators—and its technical findings are consistent with the hazards alleged here.

46.    The article reported that ten years after introduction of a new polyurethane formulation in a cardiac lead, an unexpectedly high rate of in-service degradation was observed, with a 10-year cumulative failure rate of 24.5%—far higher than other insulation materials. It identified oxidation and hydrolysis as the primary in vivo degradation mechanisms, matching the cortical lead coating loss and exposed wire documented in Plaintiff's 2022 and 2025 explants.

47.    The authors conceded that FDA-recognized standards for permanent implant leads had not been updated in over two decades, rely heavily on short-term testing, fail to account for hydrolysis as a separate pathway, and can misclassify unstable materials as

"biostable." They emphasized the need for carefully designed accelerated in vitro testing to detect slow chemical reactions—testing which Defendant's own data showed could reveal degradation missed by real-time in vivo protocols.

48.    These admissions, made under Defendant's corporate affiliation, are evidence supporting the inference that Defendant knew or should have known that the Pellethane 80A polyurethane insulation used in the 3387 DBS leads could degrade under in vivo conditions, that existing regulatory protocols were inadequate to detect such failures, and that more rigorous premarket testing was necessary. On information and belief, such awareness predated Plaintiff's implantation and injury.

**4. Defendant's 2021 Corporate Presentation**

49.    In May 2021, the same senior materials scientist for Defendant delivered a corporate presentation titled *In Vivo Long-Term Durability of Materials in Implanted Medical Devices*. The presentation specifically addressed Pellethane 80A polyurethane insulation —used in the 3387 DBS lead—and its susceptibility to oxidation, hydrolysis, and mechanical abrasion during long-term implantation.

50.    The presenter described polyurethane's role as a critical insulating barrier and displayed photographic evidence of chronically implanted leads with splitting, abrasion, and complete coating loss. They acknowledged that regulatory guidance for new implant materials was outdated and that FDA-recognized protocols fail to reveal slow-developing degradation.

51.    Citing Defendant's prior polyurethane lead recall and independent findings of significant molecular weight loss within a few years of implantation, Defendant's own scientists confirmed that Pellethane 80A insulation in the 3387 DBS lead was chemically unstable

in vivo, that existing FDA-recognized protocols were inadequate to detect slow

degradation, and that the company had the technical means to identify these hazards

before and during Plaintiff's implantation.

52.     This knowledge imposed an independent duty under Maryland law to correct misleading

assurances of safety and reversibility, regardless of FDA's regulatory determinations.

Rather than disclose these material risks or revise labeling, Defendant continued to

market the device for chronic implantation, presenting it as reversible and durable, while

withholding information that would have allowed Plaintiff and her providers to detect or

mitigate foreseeable hazards.

**5. Specific Evidence of Knowledge and Concealment**

53.     Surgical findings, regulatory filings, and Defendant's own admissions establish that the

DBS device implanted in Plaintiff was susceptible to in vivo degradation, releasing

potentially neurotoxic and carcinogenic byproducts into brain tissue. These findings are

not speculative—they are confirmed by:

  a.  **Direct surgical observation**: Surgical documentation from 2022 records that one

      intracranial lead had undergone advanced material disintegration, with sections

      breaking apart during removal and fragments becoming lodged within cortical

      tissue and bone, making full retrieval impossible. Similar findings were observed

      again in 2025 when additional fragments were removed due to infection. These

      observations align with Defendant's own acknowledgments of coating

      vulnerability and demonstrate a real-world manifestation of the degradation

      pathway anticipated in prior reports.

b. **Defendant's admissions**: In March 2025, Plaintiff provided formal written notice to the FDA's Center for Devices and Radiological Health (CDRH), with copies to senior Defendant executives, including its General Counsel and the President of its Neuroscience Portfolio. This notice placed both the regulator and the manufacturer on record that the DBS device had disintegrated in vivo, that neither Plaintiff nor her surgeon had ever been warned of such risks, that Defendant's own safety data sheets acknowledged toxic breakdown byproducts, and that Plaintiff was only then able to identify device degradation as the cause of her injuries. The CDRH promptly replied and referred the matter to the FDA's Allegations of Regulatory Misconduct Team, which opened a file on Plaintiff's behalf. Following receipt of this notice, a representative of Defendant contacted Plaintiff by telephone. The conversation was contemporaneously documented and can be corroborated. During the conversation, the representative stated that: (a) degradation of the implanted system was expected over time; (b) that this was not a one-off event; (c) they had consulted the materials team and the resulting byproducts were likely mildly toxic but presumed to be released at levels too low to be significant; (d) no long-term safety data had ever been disclosed to patients; (e) marketing continued to emphasize "reversibility" despite knowledge of embedding and irretrievability; and (f) warnings were limited to protect market acceptance. This was the first and only direct acknowledgment Plaintiff received in nearly two decades regarding the device's in vivo breakdown and toxic potential. These statements support Plaintiff's allegation that concealment of these hazards was not inadvertent but reflected corporate decision-making.

    c.  **Regulatory records**: FDA materials for Defendant's 3387/3389 DBS leads document biostability qualification of the polyurethane tubing and verification of a PTFE (fluoropolymer) coating as part of design qualification testing. Post-approval studies further targeted 4,4'-methylene dianiline (MDA) and tin among extractables, reflecting recognized polyurethane degradation products and catalyst residues. Publicly available filings do not show whether Defendant (or FDA) ever evaluated particulate release from fluoropolymer components under long-term micromotion or electrochemical stress. Given that fluoropolymers (e.g., PTFE) are present in the lead system and are addressed in the scientific literature as potential PFAS-class concerns in some contexts, the possibility of persistent fluorinated particulates remains a scientifically plausible risk requiring confirmation. Plaintiff has repeatedly requested the complete extractables/ leachables datasets; these have not yet been produced.

    d.  **Pattern of similar failures**: For more than a decade, FDA's MAUDE database has recorded cases of lead disintegration, retained fragments, and failed removal attempts involving the same or similar DBS model(s)—evidence that these hazards were neither isolated nor unforeseeable.

54.    Taken together, this evidence supports Plaintiff's allegation that Defendant was aware of the degradation risk, did not fully disclose it, and promoted the device as "reversible" and "removable" despite foreseeable risks of irretrievability and toxicant release. The facts that follow in the timeline are set against this backdrop of alleged, foreseeable, and undisclosed hazards.

**B. Implantation & Early Years**

55.    In 2005, Plaintiff underwent implantation of Defendant's DBS device after a preoperative
MRI confirmed a structurally normal brain. At age 21, she fell within FDA's regulatory
definition of "pediatric" for device oversight (birth through age 21 up until the 22nd
birthday), as reflected in FDA's 2004 guidance, placing her under Pediatric Advisory
Committee protections. At the time, she had no diagnosed cognitive, psychiatric, or major
motor deficits beyond her baseline movement disorder.

56.    Defendant assured Plaintiff that the system was reversible, could be safely removed, and
would not limit future medical care. No warnings were given that the device's materials
could degrade in vivo, release biologically active compounds, fragment, adhere to brain
tissue, or permanently preclude MRI access. She was told only that therapeutic benefit
could not be guaranteed.

57.    By the time of implantation, Defendant and FDA were on notice that Pellethane and
related polymers were prone to oxidative and hydrolytic breakdown in other implantable
leads, prompting recalls in cardiac devices. FDA's conditions of approval further required
Defendant to investigate extractables and potential toxicity. Despite this history, no
reproductive toxicology data was disclosed, even though the device was foreseeably used
in women of childbearing age. The absence of such data deprived Plaintiff of the ability
to make informed reproductive choices, including whether implantation could expose
future pregnancies to toxic degradation byproducts.

58.    Any references to degradation risks were confined to vague, generalized statements in
post-operative manuals—insufficient to inform physicians or patients of the magnitude
and irreversibility of the risks. Had Plaintiff been warned, she would have never agreed to

implantation. Instead, Defendant presented an effectively irreversible and investigational device as if it carried no long-term, systemic, or reproductive hazard.

## C. Systemic Decline

59.    For the first several years after implantation, Plaintiff's condition appeared stable. In or around 2011–2012, however, she began experiencing subtle but progressive neurological changes: worsening fatigue, unusual stimulation side effects not previously documented in her record and mild issues with fine motor control on the left side.

60.    Between 2013 and 2014 the DBS device was used intermittently but began producing unexplained side effects. Clinical records from that period document elevated and drifting impedance readings that physicians described as "of uncertain significance." While such changes can sometimes arise from benign factors such as minor scar-tissue formation, they may now be recognized as the earliest indicators of lead or insulation degradation. At the time, only the Defendant possessed the broader post-market data from other implantable leads that could have identified degradation as a foreseeable cause.

61.    In or around this time period, Plaintiffs treating neurologist brought in a Defendant representative into the clinical setting for review. Plaintiff repeatedly voiced concerns, yet instead of investigating, she was told to "adjust her expectations." Defendants representative reassured Plaintiff and her physician that her symptoms were likely "somatic," overriding clinical judgment and shutting down further inquiry.

62.    In early 2014, during her first trimester of pregnancy, reactivation of the DBS device was followed within minutes by an acute neurological episode consistent with a cortical insult. The episode resolved after deactivation but left residual confusion and new weakness on her left side, most notably in her left hand and arm. MRI was

contraindicated because her Soletra neurostimulators were not MRI compliant, and CT imaging was deferred due to pregnancy. When CT was eventually performed in 2015, it showed no gross abnormalities or acute changes.

63.    By 2016, Plaintiff reported new left-sided weakness and emerging cognitive difficulties, findings that were documented in both MOCA testing and clinical notes. The device batteries were replaced, and subsequent impedance testing revealed abnormal readings; one contact was deactivated as a precaution. Thereafter, Plaintiff developed severe headaches whenever stimulation was activated, consistent with ongoing system instability. From 2017 forward she kept the stimulator turned off, except for brief trial activations—each of which reproduced the same intolerable side effects.

64.    Device degradation was never disclosed by Defendant to inform patient or provider decision-making. While Plaintiff raised concerns, her physicians appeared to lack both the diagnostic tools and the manufacturer-supplied information necessary to link her symptoms to device failure or to justify explant.

65.    During this period, Plaintiff's systemic decline progressed. She developed hearing loss, severe dental deterioration requiring twenty-two extractions or reconstructions, repeated weight loss, relentless fatigue, vascular/cerebral/or autonomic dysregulation, gastrointestinal symptoms of unclear etiology, and increasing physical fragility in addition to multiple early miscarriages. Multiple providers speculated about possible causes—occasionally pointing to her DBS device—but never directly connected her worsening condition to the implant.

66.    Influenced by Defendant's promotional materials emphasizing "reversibility," "removability," adaptability, and with both Defendant and physicians emphasizing it's

safety, Plaintiff reasonably believed any device issues could be addressed when
circumstances allowed. In or around 2019–2020, elective removal was discussed but
deferred due to the COVID-19 pandemic.

**D. Concealment and Diagnostic Obstruction**

67.    Defendant never disclosed that breakdown of the lead insulation was a foreseeable risk.
From the start, diagnostic options were obstructed by both design and omission. After
Plaintiff received her device in 2005, MRI—the only imaging capable of detecting
device-related brain injury—was contraindicated. Years later, only limited scans under
restrictive conditions were permitted. CT imaging cannot reveal polymer breakdown or
subtle cortical injury. Impedance readings fluctuated over time, but without disclosure
that such anomalies could indicate insulation failure, they were dismissed as
inconclusive.

68.    The 2022 explant surgery provided the first and only confirmation that the intracranial
lead had disintegrated. By the time this degradation became clinically apparent,
intervention options were already limited, and the absence of diagnostic access had
prevented any earlier detection or mitigation. The retained fragments and breakdown
byproducts are permanent, rendering MRI unsafe indefinitely and leaving Plaintiff in a
continuing diagnostic trap.

69.    Defendant's omissions created a closed system of harm: the device degraded, concealed
its own failure through imaging restrictions and ambiguous diagnostics, plausibly
restricted removal, and—on information and belief—left treating physicians without the
knowledge or guidance necessary to intervene. Each year without diagnostic clarity has
compounded the injury. The inability to evaluate the damage has allowed the underlying

pathological process—whether degenerative, inflammatory, or toxic—to progress unchecked. Plaintiff's neurological and systemic condition continues to deteriorate while the central question of causation remains unresolved—a foreseeable outcome of the very barriers Defendant built into the device's design, labeling, and regulatory oversight.

**E. First Surgical Confirmation (2022)**

70.    In 2022, partial explant surgery provided the first direct confirmation of advanced material breakdown. The coating on the right intracranial lead had completely disintegrated, and the lead fractured during removal, leaving a portion of the platinum–iridium conductor embedded in cortical tissue and bone. The explanting neurosurgeon documented that the lead "fell apart in his hands" and reported he had not anticipated this mode of failure.

**F. Second Surgical Confirmation (2025)**

71.    In July/August 2025, Plaintiff developed a wound infection at the site of retained fragments from the 2022 procedure. Surgical removal was required. Plaintiff arranged a formal chain of custody for the recovered fragment, which again showed complete loss of insulation and adherent tissue—identical to the findings in the 2022 surgical report.

72.    This recurrence nearly three years later confirmed that the defect was not an isolated anomaly or surgical artifact, but the predictable result of a degradation process described in Defendant's own patents and later acknowledged as "expected over time."

73.    Following the 2022 explant procedure, Plaintiff experienced progressive neurological decline affecting movement, coordination, vision, speech, and cognition. Multiple independent evaluations have documented consistent abnormalities that cannot be attributed to ordinary causes or coincidental conditions. The medical and physical

evidence instead demonstrates a permanent central nervous system injury sustained by overlapping mechanisms acting together to produce progressive, irreversible harm, including but not limited to:

    a. Electrical: Insulation breakdown or conductor exposure could have permitted off-target current spread, producing erratic stimulation and potential tissue effects beyond intended targets.

    b. Structural: Explant records confirm a degraded lead was partially removed with fragments retained in situ when full extraction was deemed too risky. Surgical descriptions and postoperative findings are consistent with the possibility that traction or instrument manipulation produced local neural or vascular micro-injury, compounding pre-existing deficits.

    c. Chemical/Inflammatory: Long-term degradation of polymers and metals may release biologically active byproducts(e.g., low–molecular-weight polyurethane breakdown products, fluoropolymer particulates, dissolved platinum species) capable of chronic inflammatory activation and neurotoxic stress. Given the lack of validated long-horizon exposure limits, subtle systemic or reproductive effects cannot be excluded. The retained left lead remains in place; its present condition is unknown.

    d. Vascular: Events spanning 2014 to the present—including suspected cortical insult, possible off-target current effects, explant-related tissue manipulation, and later infection—may each have contributed to vascular dysautoregulation and localized hypoperfusion. Individually and cumulatively, these mechanisms

plausibly contributed to long-term instability and progressive cortical compromise.

    e.   Diagnostic: Retained fragments permanently contraindicate MRI, and CT lacks sensitivity for polymer degradation, corrosion, or embedded particulates. This forecloses reliable surveillance, perpetuates diagnostic obstruction, and leaves injury evolution unmonitored.

    f.   Interaction effects: These mechanisms are not mutually exclusive and may be synergistic (e.g., electrical off-target activation increasing inflammation around degraded materials).

74.   Because no safe or reliable method exists to evaluate retained hardware, Plaintiff remains at risk of continued neurological decline, systemic complications, and infection. The pattern of widespread dysfunction is consistent with overlapping mechanisms—structural disruption, inflammation, toxicity, vascular compromise, and diagnostic obstruction—each compounding the others.

## G. Foreseeable Consequences

75.   Medical and toxicological literature has long recognized that foreign material retained in the brain can trigger persistent inflammation and carry long-term neurological risks, including cognitive and motor decline. Implant materials may degrade or release byproducts—such as polymer fragments or dissolved metals—with potential local and systemic consequences. In pregnancy, research confirms that inflammation and oxidative stress can compromise reproductive and endocrine health. Plaintiff's cognitive, motor and reproductive injuries align with these established risks.

76.     Comparable patterns are documented across numerous implantable systems, including cardiac leads, orthopedic devices, breast implants, intravascular catheters, and infusion pumps. Materials science studies confirm that polyurethane insulation, including Pellethane 80A used in implantable leads, undergoes degradation in vivo, weakening performance and driving inflammatory responses.

77.     The risks of material degradation and foreign-body inflammation have been recognized for decades. Since at least the 1960s, scientific and regulatory literature has confirmed that implanted polymers and metals can break down, release biologically active byproducts, and provoke chronic inflammation. Recalls, FDA alerts, and peer-reviewed studies across device classes demonstrate that these hazards are systemic, not isolated. By the time of Plaintiff's 2005 implantation, these risks were firmly established.

## H. SGCE Overlay

78.     Plaintiff has a confirmed genetic condition known as DYT-11 (SGCE), which affects how nerve cells handle stress and electrical activity. This mutation weakens the normal protective protein that helps stabilize brain and muscle cells, making those circuits more reactive and slower to recover. Medical research, including a 2023 *Brain* journal study, shows that this defect increases vulnerability to inflammatory, or toxic stress. In practical terms, this means the Plaintiff's nervous system was already operating with reduced protection. The retained DBS fragments and the plausible inflammation created by the device likely interacted with that vulnerability, worsening the harm in a way that was medically foreseeable and consistent with known science.

79.     Defendant provided no pre-implant warnings regarding the risks of neuroinflammation, material degradation, or prenatal exposure, despite toxicology literature and its own

regulatory filings acknowledging such concerns. On information and belief, Physicians were not informed that DBS insulation could degrade, embed within brain tissue, or release biologically active compounds. In the absence of these disclosures, Plaintiff's progressive decline and continuing risks from retained intracranial hardware could not be reasonably attributed to device failure, leaving her and, on information and belief, her providers without a diagnostic path or meaningful intervention to this day.

## I. Technical Defect Mechanism

### 1. Coating Loss and Failure of Patented Neuroprotective Barrier

80.    Defendant's own patents and regulatory filings confirm that the polyurethane insulation on its DBS leads was not a trivial covering, but a critical safety barrier. As early as the 1990s, Defendant acknowledged in patents that polyurethane insulation was vulnerable to in-vivo degradation processes such as environmental stress cracking and metal-ion-induced oxidation, and described the need for overcoats or alternative materials to mitigate these risks.

81.    In U.S. Patent No. 10,882,945 B2 (issued Jan. 5, 2021), Defendant conveyed that Pellethane and related polyurethane materials "are susceptible to oxidation" under physiological conditions, leading to chain scission and environmental stress cracking. Although framed as general implantable-device knowledge, the patent applies expressly to electrical leads for neurological use. This is an acknowledgment that the insulation material used in Plaintiff's device was inherently unstable in vivo, undermining its suitability for long-term implantation in brain tissue.

82.    FDA filings for PMA P960009/PAS001 identify Pellethane 80A as the insulation material used in the Model 3387 DBS lead, and specifically note degradation testing due to

concerns about breakdown. Based on public knowledge provided by various manufacutersrs, the coating was engineered to perform three essential functions: (1) shield the conductor from body fluids, (2) prevent metal ions from migrating outward, and (3) maintain electrical stability and biological containment. When that barrier fails, all protections are lost: fluids penetrate, current spreads unpredictably, and exposed metal corrodes, releasing particulates into brain tissue. Scientific studies confirm this risk: Shah et al. (2024, *Biomaterials*) documented platinum dissolution and particulate deposition in explanted neural electrodes, while Dijk et al. (2023, *Journal of Neural Engineering*) observed in-vivo corrosion of platinum contacts in cochlear implants under chronic stimulation. These findings show that platinum, often described as "inert," becomes chemically active when insulation fails.

83.    Plaintiff's 2022 and 2025 explants confirmed exactly this scenario: degraded coating, retained fragments, bare conductor, and direct exposure to the very hazards the insulation was engineered—and patented—to prevent.

**2. Combined Electrical and Chemical Failure with Surgical Confirmation**

84.    The breakdown of Plaintiff's right DBS lead was not superficial deterioration but a fundamental change in the device's behavior in vivo. Once the polyurethane and fluoropolymer insulation ruptured, the conductive core was directly exposed to cortical tissue. This failure plausibly allowed any current to scatter into unintended brain structures, creating risks of overstimulation, localized heating, and cortical irritation.

85.    Literature on neuromodulation systems and pacing leads describes similar patterns: when insulation breaks down, current leaks, impedance drifts, and performance declines. At the same time, deterioration can release chemical byproducts identified in regulatory and

toxicology sources as harmful to neural and reproductive health. On information and belief, no safe threshold exists for chronic direct exposure of brain tissue to such substances.

86.    Surgical findings in 2022 confirmed these processes. The right lead's casing was fully disintegrated and some contacts could not be removed without risk of injury. Fragments remained embedded, and in 2025 additional pieces had to be removed after infection, while others are still in place. The left lead remains intact. These findings are consistent with progressive material failure and have permanently foreclosed safe MRI access. Plaintiff continues to live with degrading hardware that cannot be safely removed or monitored.

87.    At no point during the 17 years the device was implanted, were any warnings given that such disintegration, embedding, or diagnostic obstruction could occur. Yet throughout that time, Defendant's public messaging continued to describe the system as reversible, removable, and as preserving future treatment options.

### 3. Progressive Neurological Decline and Diagnostic Obstruction

88.    Plaintiff now presents with progressive neurological decline. Clinical assessments and functional imaging demonstrate patterns of cortical and cerebellar dysfunction that cannot be explained by her underlying genetic condition and instead indicate an acquired and ongoing injury process.

89.    The precise classification—whether neurodegenerative, inflammatory, toxic, vascular, or mixed—cannot presently be determined because the tools required to confirm or exclude each category are inaccessible. Retained and degraded hardware renders MRI and fMRI permanently contraindicated, while CT imaging cannot identify the subtle brain changes

needed to clarify Plaintiff's condition. CT cannot measure cortical thickness or gray-matter density, detect hippocampal or parietal volume loss, or reveal microvascular or demyelinating injury. As a result, CT cannot rule out early neurodegeneration, toxic or metabolic brain injury, or mild ischemic or inflammatory damage. Current imaging confirms abnormal brain metabolism but, by its design, cannot distinguish between toxic, metabolic, inflammatory, or degenerative etiologies. Nevertheless, the constellation of neuropsychological and PET findings most strongly supports, at least in part, a toxic or inflammatory–toxic mechanism. Because MRI is contraindicated, definitive structural evaluation is impossible, and no medical expert can exclude device-related injury with reasonable medical certainty given Defendant-induced imaging barriers and destruction of critical physical evidence.

90.   Explant surgery in 2022 confirmed that at least the coating on the right DBS lead had degraded, exposing bare conductor and leaving fragments embedded in bone and tissue. These findings were invisible to imaging, confirmable only intra-operatively, and absent from any monitoring or recall protocol. The removed components—the only direct physical evidence capable of confirming degradation, toxic residues, and the precise failure mode are unable to be located. However, a small remnant obtained during the 2025 infection-related procedure confirmed the absence of coating material and the presence of frayed or shredded bare wire, consistent with advanced polymer breakdown and potential leaching of neurotoxic byproducts.

91.   Defendant's failure to disclose material safety data compounds this uncertainty. Misclassified or incomplete adverse-event reports further erased lead degradation as a recognized failure mode from postmarket surveillance data. Plaintiff therefore remains in

a state of permanent diagnostic uncertainty: she cannot undergo definitive imaging, cannot verify the composition or distribution of retained material, and cannot safely withdraw from risk. This diagnostic foreclosure constitutes an ongoing harm, depriving Plaintiff of medical certainty, impeding appropriate treatment, and ensuring that the risk created by Defendant's device remains active, unquantifiable, and unremediable.

## J. Misrepresentations, Omissions, and Propagation of Reversibility Messaging

92.     From the first mention of Dystonia on Defendant's website in 2008 onward, public materials described deep brain stimulation (DBS) as "reversible," "removable," and as preserving "future therapy options." These assurances were not accompanied by explanation of circumstances that could make removal difficult or impossible, such as in-vivo degradation or retention of fragments.

93.     Over time, this framing was repeated by physicians, insurers, and advocacy groups, and it became part of how the therapy was presented in clinical guidelines, coverage determinations, and informed-consent practices. Major institutions often publicly referred to DBS as "FDA-approved," a phrase often understood to mean full Premarket Approval (PMA) yet dystonia had been authorized under the Humanitarian Device Exemption (HDE) pathway, which differs significantly from PMA in its evidentiary requirements. The distinctions were not consistently conveyed in ways that Plaintiff could readily understand.

94.     When Plaintiff was implanted in 2005, she and, on information and belief, her neurosurgeon reasonably believed that removal, if ever necessary, would involve a routine surgical procedure with standard risks. Because DBS is intended to remain in place indefinitely, the first placement carries extraordinary weight: if complications arise,

re-implantation may not achieve the same therapeutic result. That made it essential to know whether the device materials were suitable for decades of implantation. What was not disclosed was that the system had never been validated for long-term stability in neural tissue, that insulation degradation was foreseeable, or that components could become permanently embedded and impossible to remove.

95.    As time went on, internal testing, peer-reviewed publications, and post-market surgical findings began to show in-vivo degradation, tissue integration, and functional permanence. Despite this, there was no broad advisory or clarification that addressed the difference between theoretical reversibility and what was observed in practice. Provider disclosures and informed-consent materials did not reflect these developments, and references to "reversibility" remained in marketing and training materials. Similar language is still publicly accessible on the company's website at the time of this filing.

96.    These omissions carried through critical decision points, such as Plaintiff's 2016 battery replacement. At that time, MRI compatibility was presented as intact, without any discussion of how material degradation could affect safety or removal. Later surgery in 2022 revealed advanced disintegration and irretrievable fragments, confirming that removal was not straightforward and that MRI safety had been permanently compromised.

97.    Because critical clarifications were never provided, Plaintiff — and, on information and belief, her treating providers — lacked accurate and updated information that might have guided earlier removal, closer monitoring, or different reproductive decisions. As a result, Plaintiff continues to live with a retained lead believed to be degrading, without any safe means to assess or mitigate its risks. Plaintiff reserves the right to amend as discovery

clarifies the extent of knowledge and duties of both Defendant and the treating medical teams.

98.  Public-facing descriptions of DBS as "reversible" or "removable" remain available today, even though surgical and scientific evidence shows that in many cases these assurances do not reflect the clinical reality. Without qualification, these statements risk giving prospective patients and providers an incomplete understanding of the long-term implications of implantation.

## K. Patent-Stated Safety Function vs. Actual Explant Findings

99.  The 2025 explant again showed the same loss of protective coating that had been documented in 2022, confirming that this was not an isolated defect but a recurring outcome of in-vivo degradation. This finding was also acknowledged during the 2025 phone call with the manufacturer.

100. The DBS lead's insulating jacket is a critical safety barrier: it confines electrical current to the intended contact surfaces and prevents spread into healthy tissue. Defendants' materials and patents describe barrier/insulation layers that also impede the diffusion of ions and moisture, improving durability and reliability. In Plaintiff's 2022 and 2025 explants, this barrier was found to be absent, leaving conductor exposed and eliminating the protective function the coating is designed to provide.

101. Plaintiff was never informed that loss of this coating was a foreseeable possibility, nor that its failure could make the system irretrievable or unsafe. On information and belief, Physicians were not provided with clear criteria or protocols to recognize or respond to such degradation. Although scientific literature, internal testing, and post-market reports

suggest that coating breakdown was a known concern, this information was not included in any public facing or preoperative materials.

## L. Postmarket Failures, Knowledge, Concealment, and Misrepresentation

102.  Evidence from multiple sources shows that the lead components of the DBS device are susceptible to degradation inside the body. Regulatory submissions included biocompatibility reports, extractables testing, and risk assessments that recognized potential for material breakdown. Adverse event reports in the FDA's MAUDE database, together with the history of failures in other polyurethane leads, reflected the same concern. Despite this information, public-facing materials continued to describe the system as "reversible" and "removable," and brochures assured Plaintiff that "DBS Therapy will not reduce your future therapy options." These statements conveyed an impression of durability and flexibility, even though device disintegration, irretrievability, and permanent MRI restrictions could limit treatment, monitoring, or removal options.

103.  Concerns about polyurethane insulation were known long before Plaintiff's implant. As early as the 1980s, published studies and explant analyses documented that Pellethane degrades in vivo through oxidative and hydrolytic pathways, leading to cracks and eventual insulation failure. In 1991, the company issued a safety advisory for its Model 4012 lead due to Pellethane breakdown. Other pacemaker leads from the same family were later reported to have high failure rates. In 2007, more than 30,000 Sprint Fidelis cardiac leads were recalled after premature insulation failure caused by oxidative degradation of Pellethane 55D. These events placed the company on notice that polyurethane chemistry was unstable in the body. Nevertheless, Pellethane continued to be used in DBS leads, while the therapy was still described as reversible and removable.

104.    The animal studies submitted for regulatory review lasted 180 days in rabbits and 12 months in sheep—durations that could not replicate decades of implantation in the human brain. Plaintiff retained the full DBS device for over 17 years, during which she experienced progressive neurological decline, a failed explant, an infection from the failed explant, and permanently embedded degraded and/or degrading hardware. These outcomes demonstrate risks that were foreseeable but not disclosed. Similar events are reflected in multiple FDA MAUDE reports describing lead disintegration, retained fragments, and failed removals in the same model.

105.    In 2022, Plaintiff's neurosurgeon submitted a MedWatch report documenting advanced lead degradation and retained intracranial components. This provided contemporaneous, provider-verified evidence of device failure. In 2024, Plaintiff sought FDA records on device toxicity through FOIA, but almost all of the documents received were fully redacted. She also raised concerns directly with a company representative, informed by consultation with a neurotoxicologist.

106.    In its response to the MAUDE filing, the company did not dispute that degradation can occur under normal conditions. Instead, it relied on modeling to claim that released compounds were within "safe limits." Yet the company's own regulatory submissions acknowledged degradation byproducts that are classified by authorities as neurotoxic and carcinogenic, and no validated thresholds exist for long-term neural or fetal exposure to these compounds.

107.    Taken together, published studies, regulatory filings, recall history, adverse event reports, surgical findings, and even Defendants own admissions in the 2025 phone call establish that the risks of in-vivo degradation were foreseeable. Nonetheless, these concerns were

not conveyed in patient-facing or preoperative materials, and Plaintiff was left with incomplete information when making critical decisions about implantation, removal, monitoring, and pregnancy timing.

## M. Explant Findings, Spoliation, and Adverse Event Pattern

### 1. Explant and Preservation Failures

108.   Following the 2022 explantation, Plaintiff asked that all removed device components be preserved for possible forensic review. Despite repeated follow-up inquiries to the hospital's pathology department, staff reported no record of receiving the device. No components were logged, returned, or made available for evaluation. To Plaintiff's knowledge, the only non-clinical third party present during the procedure was a company representative. The current whereabouts of the explanted fragments, batteries, and wires remain unknown, and no chain of custody has ever been established.

### 2. Forensic Importance of the Missing Materials

109.   The removed components were the only physical evidence capable of directly confirming the extent of in-vivo material degradation, identifying any toxic residues, and supporting an independent causation assessment. Their absence prevents comprehensive evaluation of the device's condition at removal. The missing battery further precludes access to performance data (e.g., possible impedance logs, voltage history, error flags) that could have illuminated failure mode and timing. Chemical analysis of the fragments and any associated tissue could also have quantified known degradation byproducts and other toxicologically relevant substances.

### 3. Documented Pattern in Adverse-Event Reports

110. Public FDA reports reflect similar outcomes with the same or closely related DBS device, including degraded or unrecoverable leads and unexamined explants. Illustrative examples include:

    a. MDR 4388496 (2015, implanted 2006): Lead fractured; difficulty in removal; fragments remain. *Coded as:* Break (1069).

    b. MDR 6141301 (2016, implanted 2010): Lead breakage; lead fused to brain tissue; fragment unretrieved and not preserved. *Coded as:* Break (1069); Difficult to Remove (1528); Device or Device Fragments Location Unknown (2590).

    c. MDR 6615027 (2017, implanted 2008): Lead corrosion and degradation. *Coded as:* Degraded (1153).

    d. MDR 6940756 (2017, implanted 2013): "Environmentally assisted degradation of the insulation." *Coded as:* Connection Problem (2900).

    e. MDR 7395677 (2018, implant date unknown): Lead insulation disintegrated; high impedance; device breakage. *Coded as:* Break (1069); High Impedance (1291).

    f. MDR 8518503 (2018, implanted 2016): Device degradation due to corrosion. *Coded as:* Degraded (1153).

    g. MDR 8129962 (2018, implanted 2012): Insulation gone; bare wires exposed; leads brittle. *Coded as:* Break (1069); High Impedance (1291); Peeled/ Delaminated (1454); Adverse Event Without Identified Device or Use Problem (2993).

    h. MDR 8729499 (2019, implanted 2009): Rust-like substance on connection; degradation suspected after 10 years. *Coded as:* Degraded (1153); High Impedance (1291).

i. MDR 9396054 (2019, implanted 2015): "Insulation had come completely off the lead." *Coded as:* Break (1069); High Impedance (1291).

j. MDR 10223450 (2020, implanted 2015): Corroded sheath; device degradation; explanted lead lost before analysis. *Coded as:* Break (1069); Degraded (1153); High Impedance (1291); Migration or Expulsion of Device (1395); Inappropriate/ Inadequate Stimulation (1574); Adverse Event Without Identified Device or Use Problem (2993).

k. MDR 13366510 (2022, implanted 2015 – Percept unit): "Degradation of insulation consistent with metal ion oxidation." *Coded as:* High Impedance (1291); Connection Problem (2900); Device Contamination with Chemical or Other Material (2944).

l. MDR 16267648 (2023, implanted 1991): Device disintegration; explant not attempted. *Coded as:* Degraded (1153); Migration or Expulsion of Device (1395).

m. MDR 19459916 (2024, implant date unknown): Lead degraded; system type not specified.

n. MDR 19883739 (2024, implanted 2015 – Percept unit): High impedance due to degradation in the lead casing. *Coded as:* Break (1069); Impedance Problem (2950).

### 4. Coding and Oversight Limitations

111. Defendant's adverse-event reports were entered into FDA's public MDR database, but the way those events were coded concealed material risks. For example, MDRs 7395677 (2018) and 19883739 (2024) were coded only as "break" or "impedance problem," and MDR 13366510 (2022) as "high impedance" and "connection problem," even though the

manufacturer's own analysis in that case noted "degradation of the insulation consistent with metal ion oxidation." Likewise, MDR 6940756 (2017) described "environmentally assisted degradation of the insulation," but was coded only as a "connection problem."

112.    The Pediatric Advisory Committee (PAC), which reviewed the dystonia HDE annually from at least 2015 through 2025, relied on searches of this database. In earlier cycles (2018, 2019, 2020, and 2022), FDA captured implants dating back as far as 2001–2003, which included the earliest dystonia patients. Beginning in 2021 and again in 2023, however, the scope narrowed to implants on or after 2005. By 2024 and 2025, it narrowed further to implants on or after 2010, excluding Plaintiff's 2005 implant and her cohort.

113.    Because manufacturers assign the initial MDR codes that FDA later aggregates, Defendant's choice of generic labels ensured that even when degradation was described, it did not appear in PAC's public summaries as a distinct hazard. For example, MDR 8129962 (2018; implant 2012) described "insulation gone" and "bare wires exposed," but was coded only as "break," "impedance," and "peeled/delaminated." MDR 8729499 (2019; implant 2009) documented a "rust-like substance" on the connection, but was categorized only as "degraded" or "impedance." MDR 9396054 (2019; implant 2015) reported that the insulation had "come completely off of the lead," but was coded as "break; high impedance." MDR 10223450 (2020; implant 2015) described a "corroded" sheath but was coded as "break," "degraded," and even "no identified problem." MDR 13366510 (2022; implant 2015, Percept model) acknowledged "degradation of the insulation consistent with metal ion oxidation," yet was coded as "high impedance," "connection problem," and "device contamination." MDR 19883739 (2024; implant

2015, Percept) tied high impedance to "degradation in the lead casing," but was coded only as "break" and "impedance problem."

114.    The combined effect was a two-layer gap in oversight: first, the exclusion of the earliest cohorts, and second, the miscoding of degradation in the remaining reports. Together, these omissions allowed the device to continue being described as "appropriate for pediatric use," while the longest-exposed patients—the very population most likely to reveal long-term failures—were left invisible.

115.    Plaintiff's 2005 implant and her cohort were therefore excluded from meaningful review at precisely the moment when long-term complications were surfacing, leaving PAC's conclusions incomplete and materially misleading. Compounding this, the physical evidence that could have confirmed failure mode and timing—retained fragments and battery data—was not preserved. The destruction or loss of this evidence materially impairs independent evaluation and undermines both patient safety and informed medical decision-making.

## N. Reproductive Harm and Fetal Injury

116.    In January 2014, during the first trimester of pregnancy and shortly after device reactivation, Plaintiff experienced an acute neurological event consistent with a cortical episode lasting forty minutes, which resolved upon deactivation of stimulation. The treating neurologist documented the episode, noting, "I cannot explain her unusual symptoms." Device logs from the same period showed abnormal electrode impedances (>2000 ohms). Without guidance or disclosure regarding the possibility of insulation degradation, cortical insult, or fetal vulnerability, the episode could not be properly interpreted.

117. No warning was provided about the heightened fetal risk of maternal cortical disturbance during early pregnancy, because such risks were not described in device labeling or, on information and belief, physician training. This event illustrates the systemic information gap: physicians were not supplied with the knowledge necessary to recognize in-vivo lead degradation or assess reproductive implications, leaving both doctor and patient without critical safeguards.

118. In 2022, explant confirmed complete disintegration of the right lead's coating—consistent with a long-developing degradation process rather than a sudden failure, as reinforced by Defendants 2025 phone call. Elevated/drifting impedances, erratic stimulation responses, and progressive neurological decline corroborate ongoing breakdown well before removal. Published literature likewise reports that polyurethane insulation and platinum–iridium electrodes can degrade and corrode under chronic stimulation, producing biologically active byproducts and inflammatory effects.

119. These mechanisms make maternal and fetal exposure medically plausible during Plaintiff's 2013–2014 pregnancy and the subsequent breastfeeding period through 2017. Plaintiff's child later manifested developmental impairments consistent with prenatal cortical disruption; no genetic, infectious, or obstetric cause has been identified. Plaintiff's DYT11 variant is not expressed in the child.

120. Plaintiff experienced early pregnancy losses between 2019 and 2022, and again in 2024 following partial device removal. Scientific literature recognizes that systemic inflammation and oxidative stress can impair uterine receptivity and placental development, contributing to early pregnancy loss. Plaintiff's PET imaging and neuropsychological findings demonstrate patterns consistent with chronic neurotoxic and

inflammatory activation known to disrupt endocrine and immune balance essential for implantation and early gestation.

121.    No premarket or postmarket studies were ever conducted to evaluate reproductive or placental safety in long-term implant recipients, nor were any reproductive toxicology assessments included in Defendant's FDA submissions. Defendant failed to address or disclose foreseeable reproductive risks associated with material degradation, inflammatory load, or chronic exposure to decomposition byproducts, leaving these hazards untested, unmitigated, and undisclosed to physicians or patients.

122.    Defendant provided no fetal safety studies, monitoring protocols, or meaningful reproductive warnings. On information and belief, the physician labeling stated only that "safety and effectiveness have not been established" in pregnancy, while patient materials characterized pregnancy risks as "unknown." These statements omitted the foreseeable hazards arising from lead-insulation degradation, toxicant release, maternal neuroinflammation, and unintended current spread. The absence of disclosure, testing, and preserved explant materials prevented timely medical evaluation and monitoring but does not defeat causation, where the documented medical course, intraoperative device findings, and established scientific literature together support a reasonable inference of reproductive harm.

## O. Functional, Financial, and Family Loss

123.    Plaintiff's neurological injury has been compounded by the loss of reliable emotional and caregiving support, leaving her isolated during a period of heightened medical vulnerability. Cognitive and executive deficits interfere with planning, organization, multitasking, and fatigue management in daily life. As her health challenges progressed,

Plaintiff was forced to scale back her business. Her child continues to experience developmental challenges that were neither anticipated nor disclosed.

124.    Resulting harms include substantial deterioration in quality of life; sustained impairment of daily functioning; loss of earning capacity and career trajectory; disruption of family stability and reproductive autonomy; and enduring medical constraints—permanent MRI contraindication and retained, degrading intracranial hardware—that shut off routine diagnostics, impede timely intervention, and require continuous medical management.

125.    Recent PET imaging has confirmed objective evidence of progressive brain injury. Yet Defendant has provided no meaningful monitoring, guidance, or intervention. The future course remains unknown: retained fragments and continued exposure pose risks of further neurological decline and systemic complications. Despite longstanding awareness of material degradation and toxicological hazards, Defendant implemented no safeguards, testing protocols, or preventive measures, leaving Plaintiff in a state of ongoing and foreseeable danger.

**P. Public Risk, Continuing Hazard, and Summary of Liability**

126.    In March 2025, Plaintiff submitted a formal complaint to FDA's Center for Devices and Radiological Health regarding undisclosed risks of lead degradation. The difficulty in detecting device-related injury arose from the absence of disclosures that degradation was possible, leaving a diagnostic gap that obscured the true cause. Plaintiff and her providers were left with only a partial understanding of the device's dangers because key risks were minimized or never disclosed. Residual intracranial fragments remain in place, cannot be safely removed, and continue to break down, as confirmed by infection and surgical findings in 2025.

127. Defendant itself referenced "breakdown byproducts" in Plaintiff's MDR, implicitly admitting in-vivo degradation. Yet rather than analyze Plaintiff's explant or quantify those byproducts, Defendant asserted that any chemicals released would be "at safe levels." No new testing was conducted on Plaintiff's explanted components, and the hardware was not preserved, preventing independent evaluation. Defendant further invoked FDA approval while disregarding the very condition of that approval: disclosure of material breakdown risk, which was never provided to Plaintiff or, on information and belief, her physicians.

128. No public data has established safe thresholds for intracranial exposure to polyurethane degradation products, PFAS particulates, or platinum ion diffusion. Federal regulators have themselves identified removal difficulty, tissue damage, overheating, and toxic leakage as material risks of chronically implanted brain–device interfaces. In 2022, FDA rejected Neuralink's request to begin human trials until such risks could be addressed— concerns identical to those raised here.

129. In July 2025, the agency's Pediatric Advisory Committee convened to evaluate continued approval of the Medtronic Deep Brain Stimulation system under Humanitarian Device Exemption H020007 (FDA Docket No. FDA-2025-N-1246). The Committee's public summary and voting record reaffirmed pediatric approval but made no reference to degradation data, retained-hardware outcomes, or any pending patient-safety submissions. In November 2025, after learning that the July review had proceeded without consideration of these issues, Plaintiff submitted a letter and presentation supporting materials to the same docket, including MAUDE adverse event samples and documentation of explant degradation. The sequence of events demonstrates that the

Committee's evaluation was conducted on an incomplete evidentiary foundation, and that Plaintiff's data submission—incorporating postmarket evidence of degradation—was made only after pediatric approval had been reaffirmed. These facts support Plaintiff's contention that material safety information was not fully conveyed to regulators, physicians, or patients. Plaintiff will supplement this Complaint with the official Pediatric Advisory Committee transcript and docket materials from FDA Docket No. FDA-2025-N-1246 once they are publicly released.

## VII.    COUNTS OF ACTION

### A. Parallel Duty Disclaimer

The factual allegations in this Complaint describe conduct that violated both independent duties under Maryland law and duties already imposed under federal regulations. References to federal requirements are included only to show that Defendant's conduct fell below both sets of obligations, not to expand them. Plaintiff does not seek to impose requirements different from or in addition to the Federal Food, Drug, and Cosmetic Act (FDCA) or FDA regulations. Citations to 21 C.F.R. §§ 801.6, 803.50, 803.56, 814.84, 814.124, and related provisions are offered solely as evidence of industry standards of candor, reporting, and disclosure that mirror Maryland's independent common-law duties to warn of known or knowable risks, to avoid misrepresentation, and to protect patients from foreseeable harm. Liability in this Complaint arises from Maryland state-law duties, which exist in parallel with—but not in addition to—federal requirements.

### B. Exhibit Handling

Plaintiff submits, and incorporates by reference, the exhibits filed concurrently with this Complaint (the "Exhibit Set"). The Exhibit Set contains example regulatory records, labeling ,

excerpts, website captures, FDA documentation referenced herein. These exhibits are provided to assist the Court in contextualizing the allegations and are not intended to substitute for full evidentiary presentation. Plaintiff reserves the right to supplement, amend, or narrow the Exhibit Set in accordance with the Federal Rules of Civil Procedure, applicable local rules, and any subsequent scheduling or protective orders.

## COUNT I – STRICT LIABILITY / NEGLIGENCE – FAILURE TO WARN

130.   Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

131.   At the time of implantation, Plaintiff fell within FDA's "pediatric" classification, facing decades of exposure to a permanent intracranial device. Federal safeguards applicable to pediatric patients—including Institutional Review Board oversight, specialized reporting obligations, and Pediatric Advisory Committee review—underscore the foreseeability and materiality of long-term risks in this population. Plaintiff does not seek to enforce these federal requirements; rather, they establish the context in which Defendant's independent state-law duty to warn arose under Maryland law.

132.   Under Maryland law, a manufacturer must warn of dangers known or reasonably knowable, avoid material misrepresentations, and provide the information necessary for safe use. *Sard v. Hardy*, 281 Md. 432 (1977) (consent invalid without disclosure of material risks); *Gourdine v. Crews*, 405 Md. 722 (2008) (duty to warn of foreseeable hazards); *Doe v. Miles Labs.*, 927 F.2d 187 (4th Cir. 1991) (duty arises when information shows a material risk). That duty continues postmarket and includes the obligation to update labeling as new risks become known. *Wyeth v. Levine*, 555 U.S. 555 (2009)

(manufacturers remain responsible for strengthening warnings in light of newly acquired information).

## A. Preoperative Omissions

133.    At the time of implantation in 2005, Defendant failed to:

    a.   Warn in patient-facing materials that the device's materials could degrade *in vivo*, releasing neurotoxic byproducts, obstructing safe removal, and creating permanent MRI contraindications.

    b.   Disclose reproductive and developmental hazards, despite internal and published data that constituent materials—including Pellethane 80A polyurethane, organotins, PFAS-class fluoropolymers, and platinum corrosion products—can cross the placenta and disrupt fetal development.

    c.   Correct marketing and training materials that described the system as "reversible," "removable," and preserving "future options," despite contemporaneous evidence that safe explantation was often impossible and that insulation breakdown was foreseeable.

    d.   Provide preoperative disclosure of warnings already present in restricted physician manuals, including statements acknowledging that "over time, there is some risk that the lead could break down… [and] the breakdown materials are known to cause nerve damage or cancer in animals." These warnings were withheld until after implantation, stripped of context, and therefore ineffective to secure informed consent.

e.  Warn that the device could permanently foreclose MRI/fMRI—the only

modalities capable of detecting early cortical, microvascular, or demyelinating

injury—and disclose that CT cannot provide equivalent diagnostic information.

## B. Postmarket Omissions

134.  After market entry, Defendant failed to:

a.  Update labeling or issue physician communications in response to repeated

MAUDE and explant reports documenting fractured, degraded, or unretrievable

leads (e.g., MDRs 4388496 (2014), 7395677 (2018), 8129962 (2018), 10223450

(2020), and 14577339 (2022)).

b.  Disclose that lead degradation and retained fragments could permanently

foreclose MRI access, obstructing detection of brain pathology and foreclosing

diagnostic certainty.

c.  Implement monitoring, imaging, or explant protocols even after peer-reviewed

studies and internal testing confirmed oxidative and hydrolytic breakdown of

Pellethane.

d.  Warn physicians that Plaintiff's erratic stimulation effects and impedance

anomalies were consistent with insulation failure, not patient variability, and that

continued stimulation could exacerbate injury.

e.  Provide reproductive risk data or patient advisories once postmarket reports

indicated that degraded devices could release neurotoxic metals and polymers

into brain tissue and systemic circulation.

135.  The foreseeability of these risks was underscored by Defendant's own prior product

history: FDA advisories on polyurethane pacemaker leads in the 1980s–1990s;

Medtronic's 1991 advisory for Model 4012; and the 2007 Sprint Fidelis recall of over

30,000 leads due to oxidative degradation. Courts recognize that prior product failures

inform foreseeability and duty to warn. *Eagle-Picher Indus., Inc. v. Balbos*, 326 Md. 179

(1992).

## C. Postmarket Misreporting (Parallel Particulars)

136.     Defendant recorded adverse events involving in-vivo insulation breakdown under broad

categories such as "lead break," "impedance problem," or "mechanical failure." These

codes may have suggested isolated structural issues, when in fact explants or attempted

explants confirmed progressive chemical degradation with conductor exposure and

fragment retention.

137.     Federal regulations require manufacturers to report malfunctions that, if they recurred,

could cause serious injury, and to classify events accurately to facilitate signal detection.

When degradation is coded under generic terms (e.g., 'malfunction,' 'high impedance,'

'explant'), it does not appear as a distinct failure mode, making it harder to recognize a

systemic hazard.

138.     Labeling materials acknowledged that polyurethane components could breakdown and

release potentially neurotoxic compounds. On information and belief, that language

appeared only in Rx-only, post-implant manuals rather than in pre-implant patient

materials or physician training. Defendant could have provided equivalent, plain

warnings to implanting providers and Plaintiff before consent, but did not, leaving

decision-makers without critical risk information.

139.     Public sources—including MAUDE narratives and explant descriptions—document

instances of lead disintegration and fragment retention in other patients. Whether

additional events were underreported or miscoded is a matter for discovery; the available record already suggests that real-world occurrences of coating breakdown are not fully visible in aggregate data.

140.    The absence of the term 'degradation' in routine medical records is not proof of safety. If physicians were not warned that degradation was a foreseeable risk with neurological consequences, they had no reason to associate progressive decline with device failure.

141.    In the ordinary course, accurate coding and clear pre-implant warnings allow regulators and clinicians to identify patterns and issue corrective communications. Had such information been provided here, Plaintiff's providers would have been materially better informed at key decision points—including the 2015–2016 impedance anomalies, the 2020 explant discussion, and the 2022 partial explant.

142. 2014–2020, Defendant possessed newly acquired information from:

    a.    Internal extractables testing under PMA P960009 showing insulation breakdown under physiological conditions;

    b.    FDA-mandated labeling acknowledging polyurethane may release harmful compounds and that long-term safety was unproven, which Defendant confined to Rx-only manuals inaccessible before surgery;

    c.    Peer-reviewed publications, including by Defendant's own scientists, documenting oxidative and hydrolytic degradation of Pellethane in vivo; and

    d.    MAUDE reports confirming disintegration, fragment retention, and irretrievability in other patients.

**D. Reliance and Causation**

143. Plaintiff's implanting neurosurgeon confirms he was never informed that DBS leads could degrade in vivo and relied on Defendant's training materials in counseling Plaintiff.

144. Had he been warned about in-vivo degradation, irretrievability, and MRI foreclosure, his risk counseling and recommendation would have differed (including deferral or alternatives), and Plaintiff would not have consented.

145. Because the device is available only by prescription, Defendant's duty to warn ran primarily to the implanting team. Confining critical warnings to Rx-only materials delivered after implantation defeated informed consent.

**E. Resulting Harms**

146. As a direct and proximate result of these omissions and misrepresentations, Plaintiff has suffered:

   a. Permanent neurological injury with progressive cognitive and neurological decline, and systemic complications.

   b. Permanent MRI contraindication, eliminating essential diagnostic pathways.

   c. Continuing exposure from retained degrading hardware.

   d. Emotional distress and permanent loss of reproductive autonomy.

147. These injuries are progressive and continuing. Device degradation has produced permanent neurological damage, ongoing cognitive decline, and a continuing risk of toxic exposure from retained fragments. The systemic release of degradation byproducts heightens the risk of multisystem disease, including vascular, immunologic, and inflammatory complications that cannot be ruled out or safely monitored without MRI. Plaintiff lives with a constant threat that further deterioration may occur but cannot be detected in time to prevent irreversible harm.

148.    Explanted components and the IPG/battery memory were not preserved despite their

unique evidentiary value. Plaintiff seeks an adverse-inference instruction and appropriate

sanctions for spoliation, as the loss of this evidence forecloses the most reliable means of

confirming failure mode, timing, and toxic residues.

149.    Every future pregnancy carries uncertainty regarding maternal and fetal exposure.

Because Defendant never studied long-term material safety or reproductive effects,

Plaintiff has been left without answers as to whether the risks arise from maternal

immune activation and/or neuroinflammation, direct toxicant transfer, or another

mechanism. This uncertainty is itself a continuing injury to reproductive autonomy,

forcing Plaintiff to weigh unknown dangers against the desire to conceive. That injury is

compounded by the knowledge that her child has already manifested impairments

consistent with in utero exposure to a degraded device environment, even if the precise

pathway of harm remains uncertain.

150.    Defendant designed and sold a system that was foreseeably prone to in-vivo degradation.

This breakdown left fragments irretrievably embedded, permanently barred MRI access,

and released biologically active byproducts. The design defect created not only injury, but

also diagnostic obstruction: Plaintiff's decline was misinterpreted as psychiatric or

functional because the very tools needed to confirm causation were foreclosed by the

design itself.

151.    Defendant's omissions deprived Plaintiff of the ability to refuse treatment on an informed

basis. Under Maryland law, consent obtained without disclosure of material risks is not

valid consent. *See Sard v. Hardy*, 281 Md. 432 (1977). By promoting the system as

"reversible" and "removable" while withholding contrary information, Defendant

prevented Plaintiff from making a genuine choice about implantation. Once implanted, degrading fragments could not be safely removed, leaving Plaintiff unable to withdraw from treatment. This loss of autonomy constitutes a distinct harm and supports both compensatory and punitive relief.

152.    Plaintiff also seeks damages for loss of diagnostic and therapeutic opportunities reasonably available had degradation and MRI foreclosure been disclosed (including MRI-guided therapies and timely evaluations).

153.    Because MRI/fMRI are contraindicated and CT cannot detect early cortical/ microvascular changes, Plaintiff cannot confirm stabilization or exclude progression. This ongoing inability to diagnose constitutes continuing harm and supports tolling under §§ 5-101, 5-203, and 5-201.

154.    Because the risks of lead degradation were never disclosed, and degradation is not apparent on any standard imaging, Plaintiff had no reasonable way to discover the cause of her injuries until the 2022 explant surgery confirmed the leads had deteriorated. The statute of limitations is therefore tolled under Maryland's discovery rule (Cts. & Jud. Proc. § 5-101) and fraudulent-concealment doctrine (§ 5-203). Claims on behalf of Plaintiff's minor child are independently tolled under § 5-201.

## COUNT II – FRAUDULENT CONCEALMENT / MISREPRESENTATION

155.    Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

### A. Particularity (Exemplars, 1997–2005 and After)

156.    Between 2002 and 2005, authoritative sources repeatedly characterized DBS as reversible and removable. Representative examples include: a national technology assessment used

by CMS (2002) describing DBS as non-ablative and "reversible/adjustable"; CMS

coverage materials (2003) adopting that framework; and clinical reviews (e.g., 2012)

stating "DBS is reversible and adjustable." Outside the United States, national health-

technology appraisals (U.K. NICE 2003; Ontario HTA 2005; Australia MSAC 2006)

likewise presented DBS as non-ablative and reversible. This cross-system messaging

shaped physician, payer, and patient expectations—including Plaintiff's pre-implant

counseling.

157.    In each instance, Defendant failed to disclose that lead insulation can degrade in vivo,

adhere to tissue, foreclose MRI, and often render safe removal impossible.

**B. Defendant Marketing and Website Messaging (2008–2021)**

158.    Defendant's consumer-facing website and brochures described DBS as "reversible,"

"removable," and preserving "future options," including statements (2008–2016) that the

system "can be removed." Around 2017–2018, Defendant revised language to

"removable in most cases" but still omitted material qualifiers regarding degradation,

tissue adhesion, and MRI foreclosure. Captures through the time of this submission

continued to promote reversibility/preservation of options.

**C. Amplification by Institutions and Insurers**

159.    Physicians, regulators, payers, and patients including Plaintiff relied on these

representations; they were communicated to Plaintiff and her family before the 2005

implant and reiterated thereafter, shaping management throughout its entire clinical

course notably when issues arose in or around 2013–2016 and explant decisions in 2020–

2022. This messaging was amplified across the healthcare system, including:

a. **Insurers:** Aetna ("the system can be removed, if necessary"), Cigna ("a reversible, surgical option"), UnitedHealthcare ("unlike ablative procedures, DBS is reversible and adjustable"), Anthem Blue Cross ("a reversible alternative to neurodestructive procedures"), Blue Shield of California ("DBS is nonablative and reversible"), and Arkansas Blue Cross Blue Shield ("the procedure is non-ablative and reversible; components may be removed or stimulation turned off").

b. **Medical institutions:** Medtronic's own patient site ("DBS Therapy is reversible and the system can be removed"), Cleveland Clinic ("a follow-up surgery can remove the leads and pulse generator"), Mayo Clinic ("unlike ablation surgery, DBS is reversible; tissue is not destroyed"), Mount Sinai ("the DBS procedure can be reversed, if needed"), University of Kansas Health System ("DBS is reversible and does not destroy brain tissue; electrodes and neurostimulators can be removed at any time"), and Semmes Murphey Clinic ("DBS is reversible because the electrodes can be removed").

c. **Additional amplification:** The Cleveland Clinic's 2018 brochure, BlueCross BlueShield Policy #705, and APDA educational materials (2018–2022) all referred to DBS for dystonia as "FDA-approved," omitting the critical distinction that dystonia was authorized only under a Humanitarian Device Exemption.

160.  These third-party statements are not asserted as independent bases of liability but as evidence of how Defendant's marketing representations permeated the medical and insurance ecosystem, ensuring that both physicians and patients uniformly received the same false assurances.

161. This messaging also carried into other marketed indications, including Parkinson's disease, essential tremor, epilepsy, and obsessive-compulsive disorder. In each context, Defendant emphasized adjustability and reversibility while omitting material information about long-term degradation, incomplete explant risks, and release of biologically active compounds.

**D. Scientific and Historical Knowledge of Degradation**

162. By 2005, when Plaintiff underwent implantation, Defendant already had decades of data from polyurethane-insulated pacemaker and defibrillator leads documenting oxidative and hydrolytic breakdown, cracking, and fragment retention. Peer-reviewed literature confirmed Pellethane 80A degraded in vivo. FDA safety alerts in the 1980s- 1990s and the Sprint Fidelis experience in the 2000s reinforced that polyurethane degradation was foreseeable and clinically significant. Defendant therefore knew or should have known that leads could fracture on removal, or disintegrate in situ, and that breakdown products included compounds such as methylenedianiline (classified as a possible human carcinogen by IARC and reasonably anticipated carcinogen by NTP). Yet, on information and belief, Defendant possessed no long-term neural or reproductive safety data to support its stability assurances. Defendant's own publications and presentations (including its 2020 ACS Macro Letters article and a 2021 durability presentation) acknowledged long-term degradation mechanisms and the insufficiency of prevailing tests, supporting knowledge and intent.

163. By the time Plaintiff attempted explant in 2022, Defendant had accumulated even more evidence confirming that DBS leads could fracture, disintegrate, or become irretrievable. Plaintiff was never warned that "reversibility" had already proven illusory. Had this

information been disclosed, Plaintiff could have considered alternative timing, surgical strategies, or declined surgery altogether. Instead, she proceeded under the same false assurances of removability that governed her initial consent.

164.    The reasonably foreseeable consequences of insulation failure included: exposure of conductors causing off-target current spread; loss of MRI compatibility, foreclosing a key modality for detecting device-related injury; release of biologically active degradation byproducts with known or reasonably foreseeable neurotoxic, endocrine, reproductive, and/or carcinogenic effects; retention of fragments within neural tissue or bone, complicating or precluding safe explantation; and diagnostic obstruction, as polymer breakdown is not visualized on CT and MRI may be contraindicated once degradation occurs.

## E. Regulatory Context (Not the Basis of Liability)

165.    FDA's Pediatric Advisory Committee reviewed the dystonia HDE in multiple cycles between 2014 and 2025. Those reviews relied on manufacturer-supplied MDR codes—such as "impedance," "lead break/fracture," "battery/charging," and "explant"—and did not separately identify insulation degradation as a distinct failure mode. This oversight context helps explain why the hazard did not surface in public summaries.

## F. Foreseeable Consequences and Reliance

166.    Because DBS for dystonia is elective, Defendant's duty to avoid half-truths was heightened. Having chosen to promote reversibility/removability, Defendant was obligated to disclose material qualifiers that would prevent those assurances from misleading. On information and belief, Plaintiff's implanting neurosurgeon—Defendant's intended audience—relied on Defendant's training and materials; Plaintiff relied on her

physician. Had the omitted qualifiers been disclosed, Plaintiff and her surgeon would have altered timing, pursued alternatives, or declined implantation.

167.   Defendant failed to warn that its system could degrade in vivo, leaving fragments irretrievably embedded, permanently barring MRI access, and releasing biologically active byproducts. These omissions denied Plaintiff and her physicians the knowledge necessary to monitor, diagnose, or respond to injury. The absence of such warnings compounded the hazard: Plaintiff's decline was misinterpreted as psychiatric or functional, while diagnostic obstruction ensured that causation could not be confirmed by standard tools. By failing to disclose that its device could both cause injury and conceal the ability to detect that injury, Defendant deprived Plaintiff of informed consent and left her exposed to irreversible harm.

## G. Tolling and Discovery Rule

168.   Plaintiff did not and could not reasonably discover the degradation until the November 2022 partial explant objectively revealed material disintegration of the device. Prior to that surgery, Defendant's omissions, denials, and the absence of available diagnostic tools concealed the true cause of her injuries. Under Maryland law, limitations are tolled by the discovery rule, Md. Code Cts. & Jud. Proc. § 5-101, because the cause of action did not accrue until Plaintiff learned, or through reasonable diligence could have learned, the nature of the defect. Limitations are further tolled by fraudulent concealment, § 5-203, where Defendant's misrepresentations and nondisclosures prevented timely discovery. Finally, as to her child, limitations are tolled under the minority savings provision, § 5-201. These doctrines operate concurrently, and together they preserve Plaintiff's claims and her child's claims as timely filed. Importantly, tolling under state law applies

independently of federal regulatory approval, and cannot be displaced by preemption; Defendant cannot invoke FDA labeling or clearance as a shield against accountability for concealing degradation and obstructing discovery of harm

169.   Under Maryland law, a continuing tort exists where wrongful conduct causes a series of continuing injuries that persist into the limitations period. See *Litz v. Maryland Dep't of Env't*, 434 Md. 623, 646 (2013) ("*Where harm is ongoing and continuing, the limitations period does not begin to run until the conduct or injury ceases*"); *MacBride v. Pishvaian*, 402 Md. 572, 584 (2007) (recognizing continuing tort doctrine where a defendant's acts give rise to "fresh violations" each day). Plaintiff's exposure to unretrieved, degrading implant fragments constitutes such a continuing tort.

## H. Supporting Law and Experts

170.   The duties alleged arise independently under Maryland law and run in parallel with federal requirements concerning truthful labeling and postmarket reporting. See, e.g., 21 C.F.R. §§ 801.6, 803.50(a), 814.84(b)(2). Plaintiff will present expert testimony confirming foreseeability, mechanism, and materiality, and pleads this count with particularity under Rule 9(b) (who/what/when/where and the omitted facts).

## I. Resulting Injuries and Relief

171.   As a direct and proximate result of Defendant's misstatements, omissions, and concealment, Plaintiff has sustained severe and permanent injuries. These include neurological damage with progressive cognitive decline, loss of reproductive autonomy, and the permanent loss of MRI access, which forecloses safe and accurate diagnosis or monitoring of her condition. Plaintiff remains at continuing risk from retained and degrading intracranial hardware, which represents a source of ongoing toxic and

mechanical injury that cannot be removed or mitigated. She also suffers significant emotional distress compounded by the knowledge that these outcomes were foreseeable, preventable, and directly tied to Defendant's conduct. The resulting harms are not limited to Plaintiff alone: her child now exhibits impairments consistent with in utero exposure to device degradation byproducts, underscoring the intergenerational consequences of Defendant's failures.

172.    Explanted components and the IPG/battery memory were not preserved despite their unique evidentiary value. Plaintiff seeks an adverse-inference instruction and appropriate sanctions for spoliation, as the loss of this evidence forecloses the most reliable means of confirming failure mode, timing, and toxic residues.

173.    **Clarification:** This claim does not seek to police FDA submissions. It addresses Defendant's half-truths to Plaintiff and, on information and belief, her providers—promoting DBS as "reversible/removable" while omitting material qualifiers (degradation, tissue adhesion, MRI foreclosure) that make removal unsafe or impossible in practice. The market-wide repetition of "reversibility" corroborates materiality and foreseeability. Loss of the explanted hardware and battery prevents direct testing and supports an adverse inference.

## COUNT III – BREACH OF EXPRESS WARRANTY

174.    Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

**A. Creation of the Warranty**

175.    Under Maryland law, an express warranty arises when a seller makes an affirmation of

fact or promise that becomes part of the basis of the bargain. Md. Code Ann., Com. Law

§ 2-313; *Frericks v. General Motors Corp.*, 278 Md. 304 (1976).

176.    Defendant expressly warranted in brochures, websites, IFUs, and communications that its

DBS device was:

      a.    "reversible,"

      b.    "removable," and

      c.    would not reduce future therapy options.

177.    These are binary, verifiable assurances—not puffery. They were intended to, and did,

induce reliance by physicians and patients regarding the safety, removability, and long-

term durability of the device.

## B. Defendant's Knowledge at the Time

178.    At the time these representations were made, Defendant knew that:

      a.    Pellethane 80A polyurethane degrades in vivo through oxidative and hydrolytic
pathways.

      b.    FDA required labeling to state: "the materials used in the manufacture of the
leads have been shown to be neurotoxic and carcinogenic," acknowledging
foreseeable hazards.

      c.    Safe explantation was often impossible once degradation occurred, leaving
retained fragments and foreclosing MRI access.

      d.    No long-term neural safety studies, reproductive toxicology data, or explant
feasibility testing existed for Plaintiff's population.

179.    Despite this knowledge, Defendant did not disclose degradation risks in any preoperative

patient materials. Vague warnings appeared only in Rx-only manuals available after

implantation, defeating their informed-consent function.

## C. Reliance by Plaintiff and Physicians

180.    Plaintiff's neurosurgeon relied on Defendant's representations during the 2005 implant

counseling and conveyed those assurances to Plaintiff and her family. He has repeatedly

confirmed that he was never warned that the intracranial leads could degrade and

therefore assumed ongoing safety based on Defendant's silence. Reliance recurred in

2014–2016, when impedance anomalies arose, and again in 2020–2022, when

explantation was considered. At each stage, assurances of removability and reversibility

directly shaped both physician recommendations and Plaintiff's treatment decisions.

Physicians cannot warn of risks that manufacturers withhold, and patients cannot consent

to dangers that are not disclosed. To the extent provider omissions were the product of

incomplete or misleading manufacturer information, Plaintiff leaves the scope of their

duties for judicial determination and reserves the right to amend as discovery clarifies the

flow of information.

181.    An exemplar brochure and website captures containing the "reversible/removable"

assurance is attached in the exhibits.

**D. Breach and Consequences**

182.    By continuing to warrant reversibility and removability despite contrary knowledge,

Defendant breached its express warranty. The breach had lasting consequences:

    a.   Plaintiff retains a full left lead and fragments embedded in brain tissue that cannot

       be removed or safely monitored.

    b.   The right-sided disintegration confirmed degradation was not hypothetical.

       Retained hardware exposes Plaintiff to ongoing risks of inflammatory, neurotoxic,

       carcinogenic, and reproductive harm.

    c.   MRI remains permanently contraindicated, depriving Plaintiff of essential diagnostic access and future therapy options.

    d.   Plaintiff has endured neurological decline, reproductive harm, emotional distress (including PTSD), and economic losses related to explant and revision costs.

## E. Tolling

183.    Plaintiff could not reasonably have discovered the breach until the 2022 explant revealed degraded leads. Limitations are tolled under Maryland's discovery rule (Cts. & Jud. Proc. § 5-101) and fraudulent-concealment doctrine (§ 5-203). Claims on behalf of her minor child are independently tolled under § 5-201.

184.    Under Maryland law, a continuing tort exists where wrongful conduct causes a series of continuing injuries that persist into the limitations period. See *Litz v. Maryland Dep't of Env't*, 434 Md. 623, 646 (2013) ("*Where harm is ongoing and continuing, the limitations period does not begin to run until the conduct or injury ceases*"); *MacBride v. Pishvaian*, 402 Md. 572, 584 (2007) (recognizing continuing tort doctrine where a defendant's acts give rise to "fresh violations" each day). Plaintiff's exposure to unretrieved, degrading implant fragments constitutes such a continuing tort.

## F. Relief Requested

185.    As a direct and proximate result of Defendant's breach of express warranty, Plaintiff seeks compensatory damages, economic and non-economic damages, and such other relief as the Court deems just.

186.    Plaintiff also seeks damages for loss of diagnostic and therapeutic opportunities reasonably available had degradation and MRI foreclosure been disclosed (including MRI-guided therapies and timely evaluations).

X

**COUNT IV – PRENATAL AND DEVELOPMENTAL INJURY (DAMAGES PLED IN THE ALTERNATIVE UNDER COUNTS I–III)**

187.    Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein. Consistent with Fed. R. Civ. P. 8(d)(2)–(3), Plaintiff pleads this count solely as an alternative measure of damages flowing from the misconduct alleged in Counts I (Failure to Warn), II (Fraudulent Concealment/Misrepresentation), and III (Breach of Express Warranty). No independent duty is asserted beyond those counts.

188.    Under Maryland law, manufacturers must warn of foreseeable reproductive hazards arising from known product characteristics. See *ACandS, Inc. v. Asner*, 344 Md. 155 (1996) (recognizing prenatal injury as compensable where foreseeable). Defendant's own testing and regulatory filings acknowledged that device materials could degrade and release biologically active compounds documented in toxicology literature as reproductive and developmental toxins. Yet no warnings were provided to women of childbearing age.

189.    The same concealments and misrepresentations identified in Counts I–II made reproductive and developmental injury a foreseeable risk. Potential mechanisms—pled in the alternative—include: (a) transplacental transfer of toxic degradation byproducts; (b) maternal immune activation and neuroinflammation with downstream fetal neurodevelopmental effects; (c) autonomic instability impairing placental perfusion; (d) secondary maternal stress and malnutrition associated with systemic illness from device degradation; (e) oxidative stress and mitochondrial dysfunction disrupting neuronal migration and synaptogenesis; (f) endocrine disruption affecting maternal–fetal hormone signaling; (g) epigenetic alterations increasing intergenerational neurodevelopmental

vulnerability; and (h) diagnostic obstruction from contraindicated MRI, which prevented detection and management of emerging fetal or maternal complications. Maryland law does not require Plaintiff to prove a single exclusive pathway at this stage, nor epidemiological certainty. The duty is one of candor about reasonably knowable risks, not silence until consensus emerges.

190.    Plaintiff seeks damages for loss of reproductive autonomy; pregnancy losses temporally associated with implantation and degradation; costs of maternal and fetal monitoring that would have been reasonable had the risks been disclosed; ongoing pediatric developmental evaluation and care; and related economic and non-economic harms. Defendant's concealment of reproductive and intergenerational risks denied Plaintiff the ability to make informed choices and to obtain timely monitoring, leaving both her and her child exposed to undisclosed hazards.

191.    Limitations are tolled under Maryland's discovery rule, Cts. & Jud. Proc. § 5-101, and fraudulent-concealment doctrine, § 5-203, because the causal mechanism and risk were concealed and only became knowable upon the 2022 explant revealing degraded and embedded leads. Claims on behalf of Plaintiff's minor child are independently tolled under § 5-201.

192.    Scientific literature available well before and during Plaintiff's implantation—particularly research on maternal immune activation—established that maternal inflammation itself poses foreseeable risks to fetal neurodevelopment, independent of any toxicants. Defendant's own records confirmed that device components were prone to degradation and release of biologically active compounds with toxicological significance. The absence of reproductive safety data, combined with evidence of degradation mechanisms

and maternal inflammatory risk, made disclosure essential. Plaintiff's experts will testify that these mechanisms are medically plausible and consistent with Plaintiff's pregnancy history and her child's developmental outcomes.

## COUNT V – MARYLAND CONSUMER PROTECTION ACT

193.    Plaintiff incorporates by reference all preceding factual allegations.

194.    Under the Maryland Consumer Protection Act ("MCPA"), it is an unfair or deceptive trade practice to make a false or misleading statement, or to omit a material fact, when that omission has the capacity, tendency, or effect of misleading a reasonable consumer. Md. Code, Com. Law §§ 13-301(1), (3), (9). Defendant's patient-facing website and promotional communications constituted consumer advertising in Maryland within the scope of the MCPA.

195.    Defendant marketed its DBS device as "reversible" and "removable," while omitting material facts that a reasonable consumer would consider essential to a treatment decision, including:

    a.  the risk of in-vivo insulation degradation making removal difficult or impossible;

    b.  the permanent loss of safe MRI access, an essential diagnostic tool;

    c.  the absence of long-term neural or reproductive safety data; and

    d.  the frequency with which safe removal could not be achieved in real-world use.

196.    These omissions had the capacity and tendency to mislead a reasonable consumer, even where a physician acted as intermediary.

197.    As a result, Plaintiff sustained economic losses, including:

    a.  costs of the original implantation and related procedures;

    b.  costs of attempted explant surgeries;

    c.   continuing medical expenses attributable to retained hardware and follow-up care; and

    d.   loss of the expected value of a device marketed as reversible and removable.

198.   This claim is limited to economic and equitable relief; personal-injury damages are separately pled under common-law counts.

199.   Plaintiff seeks injunctive and corrective relief under the MCPA. Defendant's misrepresentations continue to shape physician and patient decision-making for those permanently barred from MRI, including Plaintiff. Because of retained, degrading hardware, Plaintiff is excluded from pursuing future treatments but not limited to MRI-guided focused ultrasound—an emerging therapy Defendant itself promotes as a future treatment option. This is not a hypothetical harm, but an ongoing barrier to care that places other patients at the same risk of exclusion. Injunctive relief is therefore necessary to prevent continued harm, including: (a) prohibiting Defendant from marketing DBS devices as "reversible" or "removable" absent full disclosure of degradation, irretrievability, and MRI foreclosure; and (b) requiring corrective disclosures in consumer-facing materials.

200.   Require corrective disclosures that: (a) the device may degrade in vivo; (b) degradation and/or retained fragments can permanently foreclose MRI/fMRI; (c) CT cannot rule out early neurodegeneration, toxic/metabolic cortical injury, or subtle ischemic/inflammatory damage; and (d) no validated alternative monitoring protocol exists once MRI is contraindicated.

201.   Because Plaintiff could not reasonably have discovered the cause of her injuries until the 2022 explant confirmed degraded and embedded leads, limitations are tolled under Maryland's discovery rule (Cts. & Jud. Proc. § 5-101) and fraudulent-concealment

doctrine (§ 5-203). Claims on behalf of her minor child are independently tolled under § 5-201.

202. Defendant's consumer-facing representations violated Md. Code, Com. Law §§ 13-301(1), (3), (9). See *McCormick v. Medtronic, Inc.*, 219 Md. App. 485 (2014) (permitting parallel MCPA claims for misleading device representations).

203. Plaintiff also seeks damages for loss of diagnostic and therapeutic opportunities reasonably available had degradation and MRI foreclosure been disclosed (including MRI-guided therapies and timely evaluations).

204. Plaintiff also seeks costs and, if represented, reasonable attorney's fees as permitted by Md. Code, Com. Law § 13-408.

## COUNT VI – PUNITIVE DAMAGES

205. Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

206. Under Maryland law, punitive damages are available only upon clear and convincing evidence that a defendant acted with actual knowledge of a product's defect and with deliberate disregard for the health and safety of others. *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420 (1992). Defendant's conduct meets this standard.

**A. Actual Knowledge of Defect**

207. Defendant possessed actual knowledge that its DBS insulation could degrade in vivo, adhere to tissue, release biologically active compounds, and render the device irretrievable. That knowledge is confirmed by multiple independent sources:

   a. **Patents and regulatory filings:** Since the 1990s, Defendant's own patents acknowledged that polyurethane insulation is vulnerable to oxidative and

hydrolytic breakdown and proposed overcoats or substitute materials to mitigate that risk. In its 1997 PMA labeling, Defendant was required to disclose that device materials "have been shown to be neurotoxic and carcinogenic."

b. **Industry and recall history:** The hazards of polyurethane insulation were not hypothetical. FDA Safety Alerts in 1988 and 1991 specifically warned of polyurethane degradation in pacemaker leads. In 2007, Defendant's own Sprint Fidelis recall confirmed insulation failure of Pellethane-coated leads, cementing the foreseeability of the hazard.

c. **Internal warnings:** Defendant itself acknowledged the risk, stating: "over time, there is some risk that the lead could break down, and the breakdown materials are known to cause nerve damage or cancer in animals." This direct admission never appeared in patient brochures, pre-implant materials, or physician-facing warnings.

208. Together, these disclosures establish that Defendant was not confronting an unknown or emerging hazard. The degradability of polyurethane insulation and the toxic potential of its byproducts were documented in patents, confirmed in recalls, and admitted internally. Yet none of this information was provided to Plaintiff or her treating physicians at the time of implantation.

209. In 2025, a representative stated breakdown was "expected" and "not a one-off event," confirming knowledge of both the hazard and its frequency.

**B. Deliberate Disregard and Misrepresentation**

210.    ]Despite this knowledge, marketing leaders emphasized "reversibility" and "removability" in brochures, websites, and, on information and belief, physician training,

while restricting toxicology warnings to sealed, Rx-only manuals delivered after implantation.

   a.  **Messaging calibration:** In 2017, Defendant modified its website from "removable" to "removable in most cases." This calibrated response softened the language without disclosing the risk of degradation or that safe removal was often impossible once degradation began.

   b.  **Third-party echo:** Institutions such as Cleveland Clinic initially described DBS as "reversible," but later quietly revised their guides, reflecting knowledge of irretrievability. Yet Defendant continued to market reversibility, ensuring patients like Plaintiff were never warned.

   c.  **Global inconsistency:** International messaging on Canada now hedges with "possibly reversible," while U.S. messaging overpromised removability. This inconsistency underscores that Defendant knew its assurances were unsustainable.

**C. Continuing Concealment and Systemic Impact**

211.  Even after Plaintiff's 2022 explant confirmed in-vivo disintegration, Defendant continued to conceal the hazard. In its subsequent Pediatric Advisory Committee submissions, Defendant recast adverse events as routine "maintenance" issues—such as impedance anomalies or charging failures—while omitting any acknowledgment of insulation degradation or material breakdown. By miscoding and mischaracterizing events, Defendant prevented regulators from recognizing degradation as a distinct failure mode, sustaining the illusion that no hazard existed.

212.  This concealment extended beyond regulatory reporting. On information and belief, Defendant's training programs for implanting surgeons did not meaningfully disclose that lead insulation could degrade, foreclose MRI access, or release biologically active compounds. The physicians Plaintiff has consulted consistently state that they were never warned of this hazard by the manufacturer, and that the only time they became aware of degradation was when they personally observed it during explant attempts. Because disclosure was withheld, doctors were left without the knowledge necessary to counsel Plaintiff meaningfully or to connect symptoms with device failure.

213.  The full scope of what Defendant communicated—or withheld—in its surgeon training materials and professional education programs will require discovery. Yet even without that record, the existing evidence establishes systemic misconduct. By downplaying failures in regulatory submissions and omitting degradation risks in physician training, Defendant fostered widespread misinformation. Patients, providers, payers, and oversight bodies were denied the information necessary to recognize, report, or address a known hazard. This concealment ensured that the false narrative of a "reversible" or "removable" device persisted long after Defendant knew otherwise, leaving Plaintiff and, on information and belief, her physicians without the knowledge needed to prevent irreversible harm.

**D. Human Consequences**

214.  Plaintiff lives with retained, degrading hardware embedded in eloquent brain tissue. This condition has permanently deprived her of MRI access, reproductive autonomy, and the fundamental right to withdraw from unwanted treatment. Each year of uncertainty during her childbearing years constituted a continuing invasion of autonomy and bodily

integrity. The medical literature confirms that chronic neuroinflammation and material degradation can alter maternal perfusion, increase oxidative stress, and permit toxicants to cross the placenta at a stage when the fetal blood–brain barrier is immature—placing both placental integrity and cortical development at risk. These pathways are foreseeable, well recognized, and preventable. Plaintiff's child now manifests impairments consistent with such exposure, underscoring the intergenerational reach of Defendant's misconduct and the profound human cost of systemic concealment.

## E. Basis for Punitive Relief

215.    This case involves far more than negligence; it reflects deliberate concealment of material hazards in order to preserve market acceptance. Defendant's own representative, in a 2025 phone call, acknowledged awareness of device degradation while continuing to withhold this risk from patients and physicians. By omitting these known dangers, Defendant deprived Plaintiff of the ability to give informed consent and left her with degrading fragments permanently embedded in her brain.

216.    Under *Owens-Illinois v. Zenobia*, 325 Md. 420 (1992), punitive damages are available where a defendant acts with actual knowledge of risk and with conscious or reckless disregard for the safety of others. These allegations, if proven, meet that standard. Defendant's conduct was intentional, profit-driven, and undertaken in knowing violation of its duties of candor to regulators, physicians, and patients. Punitive relief is therefore warranted not only to punish past misconduct but to deter the continuation of these practices and to protect the integrity of future patients' autonomy. Plaintiff seeks an award proportionate to the gravity of the harm suffered and sufficient to impose meaningful deterrence against future violations.

**COUNT VII – NEGLIGENT DESIGN (PARALLEL; PLED IN THE ALTERNATIVE)**

217.    Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully

herein. This claim is pled solely in the alternative to Counts I–II. It does not demand that

Defendant adopt a different design; it is based on Defendant's failure to test, characterize,

and disclose the foreseeable risks of the design it chose.

218.    Under Maryland law, a manufacturer must exercise reasonable care in material selection

and must warn of risks that are known or reasonably knowable—including latent hazards

foreseeably arising in use. See *Moran v. Fabergé*, 273 Md. 538 (1975) (duty to warn of

latent dangers in reasonably foreseeable use); *Phipps v. GM*, 278 Md. 337 (1976)

(adopting § 402A & comment j); accord *Gourdine v. Crews*, 405 Md. 722 (2008)

(learned-intermediary applies to Rx products). Federal regulations impose parallel

obligations: Class III device manufacturers must characterize the long-term performance

of device materials in submissions and update labeling when new risk information

emerges. See 21 C.F.R. §§ 814.20(b)(3)(vi), 814.84(b)(2). These federal provisions are

cited only as evidence of the industry standard of candor; the duty arises under Maryland

law.

219.    The medical-device industry recognizes detectability of failure as a core component of

design safety. A reasonable manufacturer must ensure that foreseeable failure modes can

be identified and diagnosed using available clinical tools. By choosing materials that

would both degrade and render MRI unsafe without providing a validated alternative

monitoring protocol, Defendant departed from this professional standard of care.

220.    Defendant breached its duties by marketing a device insulated with Pellethane 80A—a

polymer with a well-documented history of oxidative and hydrolytic degradation in vivo

—without testing or disclosing how it would perform in brain tissue over decades of expected use. Given the known propensity of this material to break down, Defendant had an obligation to warn of that risk. Plaintiff and her providers were not told that degradation could leave fragments irretrievably embedded and permanently bar MRI, the only reliable tool for detecting subtle cortical injury. These omissions were compounded by marketing assurances of "reversibility" and "removability," which directly contradicted the foreseeable consequences of the chosen design.

221. Negligence lies not in selecting Pellethane, but in failing to investigate and disclose its degradation pathways, characterize the consequences of failure in the brain environment, and warn that the design itself carried risks of irreversible injury and diagnostic obstruction. Unlike other toxic-exposure or implant cases where causation can be tested through imaging, pathology, or epidemiology, this design left Plaintiff without those tools: MRI is permanently unsafe, CT cannot detect polymer breakdown, explant fragments were not preserved, and adverse events were miscoded to obscure degradation as a failure mode. Defendant's negligent design thus not only created injury, but ensured that injury would be concealed from detection and potentially misattributed to psychiatric or functional causes.

222. A reasonably safe design requires that foreseeable failures be clinically detectable. Defendant's design both created risk (degradation) and disabled detection (permanent MRI foreclosure) without a validated alternative protocol. The resulting diagnostic obstruction is itself a safety defect.

223. As a direct and proximate result, Plaintiff was implanted with a device that degraded, foreclosed MRI monitoring, and plausibly released biologically active compounds—

causing permanent neurological injury, progressive cognitive decline, reproductive harm, and continuing diagnostic obstruction.

## COUNT VIII – STRICT LIABILITY DESIGN (PARALLEL; PLED IN THE ALTERNATIVE)

224. Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein. This count is pled solely in the alternative. It does not demand a safer design; it alleges that Defendant's failure to disclose foreseeable consequences of its chosen design rendered the product unreasonably dangerous under Maryland law.

225. A product is defective under Maryland law when marketed in a condition unreasonably dangerous to the user. *See Phipps v. Gen. Motors Corp.*, 278 Md. 337 (1976). Defendant's DBS device embodied two interrelated hazards: (1) polyurethane insulation that predictably degraded in vivo, with fragments potentially remaining embedded and byproducts released into surrounding tissue—outcomes that cannot be confirmed or excluded because reliable testing is impossible; and (2) the foreclosure of MRI once degradation occurred, eliminating the only reliable tool to detect cortical injury, inflammatory change, or progressive harm. A device that both creates risk and disables the only means of detecting that risk is unreasonably dangerous when marketed without disclosure.

226. Defendant's own prior experience with polyurethane-insulated pacemaker and defibrillator leads—including FDA Safety Alerts in 1988 and 1991 and the 2007 Sprint Fidelis recall—confirmed that oxidative and hydrolytic breakdown of Pellethane was a foreseeable hazard. Those events provided direct notice that long-term degradation could

occur in vivo and that diagnostic confirmation would be compromised once insulation integrity failed.

227. Federal law required Defendant to characterize long-term material stability and update labeling when newly acquired information materially altered risk. See 21 C.F.R. §§ 814.20(b)(3)(vi), 814.84(b)(2). Maryland law imposes the parallel duty not to market devices in an unreasonably dangerous condition without disclosure of foreseeable hazards. This claim is disclosure-based, not a demand for redesign, and is therefore not preempted. See *Medtronic v. Lohr*, 518 U.S. 470 (1996).

228. By omitting degradation data and failing to alert investigators and regulators to the diagnostic implications of MRI foreclosure, Defendant frustrated the very oversight mechanisms Congress intended under 21 C.F.R. § 814.124. The resulting absence of meaningful IRB review and Pediatric Advisory Committee visibility deprived both physicians and regulators of the information necessary to ensure patient protection.

229. A reasonably safe design requires that foreseeable failures be clinically detectable. Defendant's design both created risk (degradation) and disabled detection (permanent MRI foreclosure) without a validated alternative protocol. The resulting diagnostic obstruction is itself a safety defect.

230. As a direct and proximate result of Defendant's omissions, Plaintiff was implanted with a device that degraded, left fragments embedded in neural tissue, and included components that could not be safely explanted. The device foreclosed MRI monitoring and released biologically active compounds—causing permanent neurological injury, progressive cognitive decline, reproductive harm, and loss of diagnostic access.

**Counts VII & VIII (Collective Framing)**

231.    Counts VII (Negligent Design) and VIII (Strict Liability Design) are pled solely in the alternative and proceed on a disclosure theory, not a redesign theory. They do not allege that Defendant should have invented a safer material; they allege that Defendant knew or should have known Pellethane insulation degraded in vivo, yet failed to test, characterize, and disclose the foreseeable consequences of that choice. The defect alleged is not Pellethane itself, but the combination of degradation and the simultaneous foreclosure of MRI—the only diagnostic safeguard. A product that both creates risk and disables the means of detecting it is unreasonably dangerous when marketed without disclosure. These counts are parallel claims under Maryland law, not preempted attempts to second-guess FDA design approval.

## COUNT IX – MISBRANDING / FALSE OR MISLEADING LABELING (PARALLEL; RULE 9(B) COMPLIANT)

232.    Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

233.    Defendant marketed and promoted its DBS device as "reversible," "removable," and preserving "future therapy options," while omitting or burying critical risk information. Although FDA-mandated professional labeling acknowledged that device materials "may breakdown" and "have been shown to be neurotoxic and carcinogenic," Defendant confined these warnings to sealed, Rx-only manuals provided after implantation—when informed consent was no longer possible. Public-facing brochures, archived websites, and training materials instead emphasized reversibility and removability, creating a materially misleading overall impression.

234.    Particularity under Rule 9(b):

a. **Who/what/where/when:** Defendant's brochures (late 2000s), archived web pages (e.g., Dec. 30, 2008; May 20, 2016), and physician training materials all contained assurances that the device was "reversible" and "removable."

b. **How:** Plaintiff's neurosurgeon conveyed these assurances in 2005 implant counseling; similar assurances shaped clinical management in 2013–2016 (impedance anomalies) and again in 2020–2022 (explant discussions).

c. **Reliance:** Plaintiff and her family relied on these assurances in electing surgery and in later care decisions.

235. By omitting the very risks FDA required in professional labeling while simultaneously promoting contradictory reversibility claims, Defendant rendered its marketing false and misleading in violation of Maryland common law and Md. Code Ann., Com. Law § 2-313. See *McCormick v. Medtronic, Inc.*, 219 Md. App. 485 (2014) (allowing parallel misrepresentation claims for DBS marketing); *Frericks v. General Motors Corp.*, 278 Md. 304 (1976) (statements of material fact create actionable warranty).

236. This claim does not seek to enforce FDA rules directly. It arises from Maryland's independent duty not to mislead patients or physicians. The federal misbranding standard, 21 C.F.R. § 801.6, is cited solely as corroborative evidence of the industry norm of candor.

237. As a direct and proximate result of Defendant's misleading assurances and concealment of contrary risk information, Plaintiff underwent implantation with a hazardous device and suffered permanent neurological injury, progressive cognitive decline, reproductive harm, and permanent loss of MRI access.

## COUNT X – FAILURE TO REPORT ADVERSE EVENTS (PARALLEL)

238.   Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully
       herein.

239.   Under Maryland law, a manufacturer has an independent duty not to misrepresent or
       conceal material risks where disclosure is necessary for patient safety and informed
       consent. This duty parallels—but does not expand upon—federal adverse event reporting
       requirements. See 21 C.F.R. §§ 803.50(a), 803.56.

240.   Defendant breached these duties by coding adverse events involving in-vivo insulation
       degradation under generic categories such as "lead break," "impedance problem," or
       "mechanical failure." Explants, including Plaintiff's 2022 partial explant, revealed
       progressive chemical degradation with conductor exposure and fragment retention, not
       acute structural breaks. By miscoding these events, Defendant obscured degradation as a
       systemic hazard.

241.   Accurate reporting may have, in the ordinary course, enabled FDA and industry to
       recognize a degradation failure mode and triggered corrective communications such as
       labeling updates or Dear Health Care Provider letters. Those communications could have
       reached Plaintiff's implanting neurosurgeon and treating neurologist before key decision
       points in 2015–2016 (impedance anomalies), 2020 (consideration of explant), and 2022
       (partial explant). With accurate information, her providers would have counseled
       differently, and Plaintiff could have avoided continued implantation or taken protective
       measures earlier.

242.   By miscoding degradation as generic "impedance/break," Defendant concealed a distinct
       failure mode, thereby preventing clinicians from associating progressive decline with
       device failure and perpetuating diagnostic obstruction in Plaintiff's care.

243.    Discovery is necessary to determine how often degradation was observed, how it was coded, and what Defendant knew at the time.

## COUNT XI – FAILURE TO UPDATE LABELING WITH NEWLY ACQUIRED INFORMATION (PARALLEL)

244.    Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

245.     Maryland law imposes a continuing duty to update warnings when new risks become known or reasonably knowable. Federal law imposes a parallel obligation: manufacturers must revise labeling when newly acquired information materially affects safety. See 21 C.F.R. § 814.84(b)(2).

246.    By at least 2014–2020, Defendant possessed "newly acquired information," including: (a) internal extractables and leachables testing identifying toxic breakdown products such as methylenedianiline (MDA) and organotins; (b) peer-reviewed publications—including by Defendant's own scientists—confirming Pellethane's oxidative and hydrolytic breakdown in vivo; and (c) MAUDE reports documenting degraded and unretrievable leads.

247.    Despite this evidence, on information and belief, Defendant failed to update labeling, physician advisories, or patient materials to reflect that lead degradation could embed fragments, release toxicants, and permanently foreclose MRI. Plaintiff's neurosurgeon has confirmed he was never warned of these risks and relied on Defendant's training and marketing in counseling Plaintiff.

248.    These omissions deprived Plaintiff of informed consent and left her physicians without any framework to recognize or connect degradation with later neurological decline.

## COUNT XII – NEGLIGENT TRAINING AND FAILURE TO EDUCATE PHYSICIANS (PARALLEL)

249.  Plaintiff incorporates by reference every allegation of this Complaint as if set forth fully herein.

250.  Maryland law requires manufacturers to provide adequate instructions and warnings so that prescribing physicians can safely guide patients. Under the learned-intermediary doctrine, a manufacturer's duty to warn flows primarily to physicians. Federal law likewise requires Class III device manufacturers to provide adequate training and information for safe use. See 21 C.F.R. § 814.82(a)(2).

251.  Defendant breached these duties by failing to train implanting neurosurgeons that Pellethane insulation could degrade in vivo, embed irretrievably, and foreclose MRI access. Plaintiff's implanting neurosurgeon has confirmed he was never informed of such risks, despite relying on Defendant's training materials and marketing assurances that the device was "reversible" and "removable." Other physicians Plaintiff has consulted expressed similar lack of awareness.

252.  A physician cannot disclose what a manufacturer withholds. By failing to equip neurosurgeons with material risk information, Defendant deprived Plaintiff of the informed consent Maryland law requires.

**Collective Summary (Counts X–XII)**

253.  Counts X, XI, and XII collectively allege that Defendant concealed known risks by miscoding adverse events, failing to update labeling when new evidence emerged, and failing to educate physicians about in-vivo degradation, irretrievability, and MRI foreclosure. Had truthful disclosures been made at the time of implantation, Plaintiff

would not have consented. Even after implantation, accurate reporting, updated warnings, and adequate physician training would have altered clinical management in 2015–2016 and again in 2020–2022, reducing the scope of injury. The absence of "degradation" in the medical record does not reflect safety but the predictable outcome of concealment.

## PRESERVATION OF CORE LEGAL THEORIES

### Parallel Federal Duties and Preemption

Plaintiff's claims arise under independent Maryland duties to warn of known hazards, disclose material risks, and obtain informed consent. These duties predate the FDCA and run in parallel with federal requirements, including:

   a. **21 C.F.R. § 801.6** - prohibiting misbranding by omission of material facts;

   b. **21 C.F.R. § 803.50** - requiring complete and accurate adverse-event reporting;

   c. **21 C.F.R. § 814.84** - requiring labeling updates for newly acquired risk information; and

   d. **21 C.F.R. § 814.124** - imposing additional obligations for humanitarian device uses.

These duties are not "different from or in addition to" federal law; they are consistent with it. Plaintiff challenges Defendant's postmarket conduct—its concealment of degradation hazards and failure to update warnings—not FDA's original device authorization.

These federal and state duties exist precisely to ensure that treating physicians have the information necessary to provide safe and informed care. To the extent Defendant withheld or miscoded risk information, it frustrated both regulatory oversight and the ability of physicians to fulfill their own duties of care.

To apply *Riegel's* shield here would invert Congress's design, granting greater immunity to devices authorized on less evidence than those that undergo full PMA review. Maryland law provides the parallel duties of candor, disclosure, and consent that Defendant failed to meet.

**HDE vs. PMA**

The device at issue was never fully Premarket Approved. Instead, it entered the market under a Humanitarian Device Exemption (HDE), which expressly waives proof of effectiveness and long-term safety. See 21 C.F.R. § 814.104(b)(2). HDE authorization requires only a finding of "probable benefit," not the "reasonable assurance of safety and effectiveness" demanded for PMA devices. See 21 U.S.C. § 360j(m)(2)(C) vs. § 360e(d)(2).

In *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323–25 (2008), the Supreme Court grounded preemption in the FDA's "rigorous" premarket approval process, which entails device-specific findings of both safety and effectiveness. By contrast, in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493 (1996), the Court held that devices cleared through the less demanding § 510(k) process are not entitled to broad preemption because that pathway imposes no substantive safety or effectiveness requirements. The HDE pathway occupies an intermediate posture. Congress expressly exempted HDE devices from demonstrating effectiveness, 21 U.S.C. § 360j(m)(2)(C), and no subsequent conversion to PMA has ever occurred.

As *Beavers-Gabriel v. Medtronic, Inc.*, 15 F. Supp. 3d 1021, 1037 (D. Haw. 2014), recognized, HDE devices lack the evidentiary foundation that underlies *Riegel*. To extend *Riegel's* full preemptive shield to HDE devices would afford them greater immunity than PMA devices themselves, invert congressional intent, and erase the statutory middle ground. The reduced evidentiary burden of HDE review was never meant to strip patients of their state-law protections.

**Diagnostic Obstruction**

Unlike other toxic-exposure or implant cases where courts relied on imaging, pathology, or epidemiology to establish causation, this case is defined by the absence of those tools—an absence created by Defendant's own design and omissions. Device degradation made MRI permanently unsafe, eliminating the only diagnostic modality capable of detecting cortical injury, vascular compromise, or subtle inflammatory change. Explant fragments—the only physical evidence that could have confirmed toxic residues—were not preserved. Adverse event reports were miscoded under generic categories, erasing degradation as a recognized failure mode in FDA surveillance.

This is not ordinary evidentiary uncertainty. It is diagnostic obstruction: a foreseeable, compounding harm engineered into the product itself. Defendant's device did not merely cause injury; it concealed the ability to detect that injury, ensuring physicians would misdiagnose progressive decline as psychiatric or functional. Under Maryland law, a manufacturer cannot profit from the evidentiary silence it created. Where concealment and design render traditional proof impossible, the absence of evidence itself becomes evidence of liability.

Defendant's concealment and design choices not only deprived Plaintiff of diagnostic tools but also deprived her treating physicians of the ability to make informed differential diagnoses, forcing them to rely on incomplete data that predictably led to misattribution of progressive neurological injury as psychiatric or functional.

Had MRI been possible, had fragments been preserved, had adverse events been accurately coded, Plaintiff could have demonstrated causation directly. Defendant eliminated each of those avenues. It cannot now invoke the resulting silence as a shield. To permit such a

defense would invert the premise of tort law and informed-consent doctrine, leaving patients trapped in a system where concealment becomes exculpation.

Defendant's misconduct ensures that Plaintiff cannot now present "toxicant levels" or MRI imaging—because those very proofs were foreclosed by design, omission, and loss. The absence of this evidence is not a gap; it is part of the injury itself. To permit Defendant to demand proof it prevented would invert the law. The Court should therefore:

    a. Recognize diagnostic obstruction and spoliation as compounding harms.

    b. Apply adverse inference instructions that degraded fragments would have confirmed Plaintiff's allegations.

    c. Reject any defense argument that absence of MRI, tissue analysis, or toxicant quantification defeats causation.

**Pediatric Safeguards**

Congress recognized that pediatric recipients face decades of exposure to implanted devices. For that reason, the HDE framework imposes heightened protections: Institutional Review Board (IRB) approval before implantation (§ 814.124), pediatric-specific reporting (§ 814.126), and Pediatric Advisory Committee (PAC) review (§ 360j(m)(6)). These provisions reinforce, rather than displace, state-law duties to warn.

Defendant's failure to provide candid warnings was especially unreasonable in this context. Plaintiff was 21 at the time of implantation—within FDA's definition of "pediatric"— and therefore part of the population Congress intended to shield through heightened safeguards.

**Consent and Disclosure Under Maryland Law**

Maryland law is clear: consent without disclosure of material risks is no consent. *Sard v. Hardy*, 281 Md. 432 (1977). FDA required warnings that polyurethane insulation could release

neurotoxic and carcinogenic compounds, but those warnings appeared only in technical manuals or post-op materials. The core hazard—that leads could degrade, fuse to tissue, release toxicants, and foreclose MRI—was never disclosed before implantation. That omission violated both Maryland law and parallel federal duties.

## Substance, Not Form

Plaintiff enforces Maryland duties, not FDCA regulations. See *Wyeth v. Levine*, 555 U.S. 555 (2009); *Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. 2013); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir. 2011). Evidence of misreporting is admissible not to "enforce" FDA rules, but to prove breach of Maryland duties to warn and disclose.

## Tolling and Continuing Tort

MRI was contraindicated, no monitoring protocol existed, and Plaintiff could not reasonably discover the cause of her injuries until the 2022 explant revealed degraded leads. The retained and irretrievable fragments continue to leach byproducts, obstruct diagnosis, and prevent withdrawal from treatment. Each day those fragments remain constitutes an ongoing violation of bodily integrity and a renewed injury. Under Maryland's discovery rule (§ 5-101), the fraudulent-concealment doctrine (§ 5-203), and, for her child's claims, § 5-201, the statute of limitations is tolled. This is not a closed episode but a continuing tort, marked by permanent implantation, ongoing exposure, and the impossibility of safe withdrawal.

## Causation and Foreseeability

Plaintiff's injuries are consistent with foreseeable mechanisms: uncontrolled current spread from insulation breakdown, toxic byproducts from degrading polymers and metals, and retained fragments producing chronic inflammation and/or vascular compromise. Defendant's own recall history, adverse-event reports, and published literature confirm that these risks were

not speculative but known. Large-scale epidemiology is unnecessary where hazard is demonstrated by internal complaint data, toxicology principles, and direct explant evidence. Nor can Defendant shift blame to genetics, autoimmune conditions, or psychiatric factors it never investigated in regulatory submissions or postmarket studies. Reliance on such post hoc speculation would be scientifically unsupported and legally inadmissible under Rule 702's reliability standard.

**Provider Knowledge and Standard of Care**

On information and belief, Plaintiff's treating physicians acted in good faith and within the limits of the information available to them. The manufacturer's labeling, training materials, and postmarket communications did not adequately describe the potential for in-vivo lead degradation, release of toxic byproducts, or the long-term implications of retained intracranial fragments. Consequently, providers lacked critical data that would have been necessary to correlate Plaintiff's progressive decline with potential device malfunction or material instability.

The applicable standard of care may have warranted heightened monitoring or consideration of device removal once abnormal impedances, unexplained neurological changes, or functional deterioration appeared. Whether those warning signs were recognizable in light of the data available at the time is a matter for expert determination.

**Learned Intermediary Doctrine**

The doctrine fails where manufacturers withhold or misrepresent material risks. On information and belief, Defendant never disclosed that intracranial leads could degrade in vivo, release toxic byproducts, or permanently foreclose MRI access. Plaintiff's implanting neurosurgeon has confirmed he was never advised of these hazards—neither at the time of implantation nor when abnormal impedances and complications later arose.

Physicians cannot warn patients about dangers deliberately concealed by the manufacturer. The doctrine presumes an informed intermediary; it does not immunize a manufacturer that withholds the very information necessary for informed counseling. Federal law requires manufacturers to investigate, code, and report adverse events accurately. Defendant's practice of miscoding lead degradation as generic "component failures" deprived FDA, treating physicians, and patients of the data needed for safe and informed medical decision-making.

If Plaintiff cannot sue FDA directly, then Defendant cannot invoke FDA's limited review as a shield. The statutory balance depends on truthful reporting; once that condition fails, so does any preemption or learned intermediary defense.

## DAMAGES

Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

As a direct and proximate result of Defendant's misconduct, Plaintiff has sustained a constellation of harms that are permanent, progressive, and medically foreseeable. These harms extend beyond the individual, encompassing intergenerational effects and systemic deprivation of choice. They fall into the following categories:

### A. Economic Damages

a. **Medical Costs (Past and Future).** Plaintiff has incurred, and will continue to incur, substantial costs for neurological, reproductive, and rehabilitative care, including specialist evaluations, therapies, potential surgeries, and long-term support services.

b. **Diagnostic Obstruction.** Permanent loss of safe MRI access has foreclosed the standard of care for detecting neurological and systemic injury. This deprivation

denies timely intervention, imposes lifelong uncertainty, and compounds

causation uncertainty by ensuring that some conditions can never be fully

evaluated.

c.   **Diminished Earning Capacity.** Plaintiff has experienced documented loss of

vocational opportunity and earning potential tied to her progressive cognitive and

neurological decline.

d.   **Household and Caregiving Services.** Plaintiff can no longer independently

perform many of the tasks central to childcare, household management, and

family caregiving. While she remains engaged as a parent and caregiver, her

impairments require substantial assistance, and the cost of replacing or

supplementing these services represents a quantifiable economic loss.

e.   **Educational and Support Costs for Minor Child.** Plaintiff's child requires

ongoing developmental monitoring and therapeutic support, which impose

additional economic burdens that were a foreseeable consequence of Defendant's

concealment of reproductive risks.

f.   **Future Medical Monitoring.** Plaintiff and her child will require court-supervised

medical monitoring, including neurological, toxicological, and reproductive

surveillance, to manage the continuing risks posed by retained degrading

hardware and transgenerational exposure.

## B. Non-Economic Damages

a.   **Neurological and Cognitive Harm.** Plaintiff suffers permanent and progressive

cognitive impairment and systemic fragility, confirmed by surgical findings,

neuropsychological testing, and PET imaging.

b. **Reproductive Autonomy and Intergenerational Harm.** Defendant's concealment deprived Plaintiff of the ability to make informed reproductive choices. Plaintiff's systemic decline and neurological instability prevented further pregnancies during most of her childbearing years. The later discovery of device degradation confirmed that her options were constrained under false assurances of safety. This harm implicates past pregnancy loss, her child's developmental delays, and the impossibility of pursuing additional pregnancies without unacceptable risk.

c. **Relational and Social Harm.** Plaintiff's injuries have strained her marriage, imposed caregiving burdens, reduced her parental and social function, and eroded her quality of life.

d. **Pain, Emotional Distress, and Anticipatory Anxiety.** Plaintiff suffers daily from embedded hardware and the knowledge that she carries unretrievable, degrading fragments inside her brain. The constant awareness of continuing risk —neurological decline, systemic disease, and reproductive hazard—produces ongoing trauma and loss of enjoyment of life.

e. **Loss of Consortium.** Plaintiff's injuries have damaged marital companionship and the spousal relationship.

f. **Loss of Autonomy.** Defendant's concealment of material risks and denial of withdrawal from exposure stripped Plaintiff of bodily autonomy and meaningful medical choice. This harm is enduring, as each day of retained fragments constitutes a fresh and continuing invasion of her person.

g. **Loss of Future Medical Options.** Plaintiff is permanently excluded from MRI-based diagnostics and therapies, including emerging treatments such as MRI-guided focused ultrasound. Defendant's assurances that DBS "would not limit future therapy options" have been revealed as false, leaving Plaintiff barred from life-saving or life-enhancing treatments.

## C. Nature and Mechanism of Injury

Plaintiff pleads in the alternative. Multiple overlapping, synergistic mechanisms—each foreseeable given Defendant's knowledge of insulation degradation—could have contributed concurrently and need not be reduced to a single pathway at this stage. The inability to isolate one mechanism is itself a foreseeable consequence of concealment, loss of explant integrity, and permanent MRI contraindication. The mechanisms below are scientifically recognized, consistent with Plaintiff's course, and material to informed consent:

a. **Electrical / Physiologic Dysfunction.** Insulation failure plausibly permitted off-target current spread and abnormal impedance behavior, producing focal insult and left-sided motor weakness (consistent with elevated/drifting impedance and post-op central activation failure on EMG/NCS).

b. **Structural / Mechanical Injury.** Progressive coating loss and retained fragments plausibly caused direct neural trauma, scarring, and cortical/bony embedding, with permanent deficits and heightened surgical risk. The 2022 explant attempt documented adherent/brittle components that could not be safely removed—confirming that safe withdrawal from treatment is no longer possible.

c. **Chemical / Toxicologic Effects.** Chronic release of degradation byproducts and foreign-body neuroinflammation plausibly contributed to cognitive decline,

fatigue, systemic/autonomic symptoms, and prenatal risk. (Defendant has acknowledged the byproducts are "mildly toxic" while asserting—without longitudinal data—that exposure is "too low to be an issue.")

d. **Network Hypometabolism / Cortical Dysfunction.** FDG-PET demonstrates bilateral parietal and cerebellar hypometabolism; neuropsychology shows reproducible deficits in attention/working memory, verbal learning/fluency, and visuoconstruction; OT documents spasticity and primitive-reflex disinhibition. Together, these support an acquired toxic-inflammatory/structural network dysfunction rather than a purely static postsurgical change. (MRI is permanently contraindicated; PET is the only available window—diagnostic obstruction is a compounding harm.)

e. **Aggravation of Pre-Existing Vulnerability (DYT11).** Device degradation, toxic-inflammatory effects, and/or surgical trauma foreseeably aggravated an SGCE-related vulnerability. Pre-implantation, symptoms were movement-limited; following years of implantation and failed explant, susceptibility plausibly progressed into cortical and cognitive dysfunction. Under the eggshell-plaintiff rule, Defendant is liable for aggravation/acceleration beyond natural progression.

f. **Vascular / Autoregulatory Sequelae.** Tissue adhesion, scarring, peri-lead inflammation, and procedure-related factors plausibly impaired local perfusion/ autoregulation, increasing risk of ischemic or stroke-like events and contributing to weakness and cognitive impairment.

g. **Diagnostic Obstruction.** Permanent MRI/fMRI contraindication forecloses principal modalities for detecting early cortical injury, demyelination, or toxic

encephalopathy. CT cannot measure cortical thickness/gray-matter density, hippocampal/parietal loss, or microvascular/demyelinating change; CT cannot rule out early neurodegeneration-like or toxic/metabolic injury.

h. **Systemic and Autonomic Manifestations.** Ongoing toxic-inflammatory burden plausibly contributed to accelerated dental deterioration and vestibular, auditory, and autonomic symptoms, degrading function and quality of life.

i. **Intergenerational Exposure.** In-utero exposure to degradation byproducts and/ or maternal immune activation plausibly contributed to the child's developmental impairments.

j. **Psychological Overlay (Secondary).** The failed explant, progressive decline, and diagnostic barriers precipitated PTSD/anxiety superimposed on neurological injury.

k. **Oxidative Stress / Mitochondrial Dysfunction.** Degradation byproducts plausibly induced oxidative stress and mitochondrial injury, disrupting cortical energetics and amplifying fatigue and cognitive decline.

l. **Endocrine / Epigenetic Disruption.** Certain degradation materials may act as endocrine disruptors/epigenetic modifiers; Plaintiff reserves this theory pending expert disclosure and literature proffer.

## D. Continuing Harm

These harms are corroborated by objective anchors: (i) operative findings of lead/ insulation disintegration; (ii) programming records and clinical measurements showing elevated and drifting impedances; (iii) temporally associated stimulation-linked neurological events; (iv)

PET imaging of cortical/cerebellar hypometabolism; (v) neuropsychological evaluations documenting progressive cognitive decline.

The injuries are permanent, progressive, and continuing, sustained by retained degrading hardware and ongoing MRI contraindication. Plaintiff will require future monitoring and life-care to address neurological, systemic, and reproductive risks, resulting in continuing economic and non-economic damages. The removed components and IPG/battery data—unique sources for confirming failure mode, timing, and residues—were not preserved; Plaintiff therefore seeks an adverse-inference instruction and related relief.

Consistent with Fed. R. Evid. 702, Plaintiff's experts will opine to a reasonable degree of medical probability using reliable methods, including differential diagnosis; correlation of operative and impedance findings with clinical course; materials-science analysis of degradation; temporal association; biological plausibility; and principled exclusion of alternatives.

## E. Legal Framework for Damages

These damages flow not from speculative theories but from foreseeable risks Defendant knew and concealed. The harms are permanent and progressive, sustained by retained fragments, ongoing degradation, and the continuing diagnostic obstruction created by MRI foreclosure. Under Maryland's continuing tort doctrine, each day represents a fresh injury.

The scope of harm supports both compensatory damages and punitive damages under *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420 (1992), because Defendant's conduct was not mere negligence but a conscious decision to withhold warnings "to protect market acceptance."

## PRAYER FOR RELIEF

Plaintiff respectfully submits that this action raises urgent questions about the limits of informed consent, the duty to validate and disclose material risks, and the ethical boundaries

between medical treatment and non-consensual exposure. These issues warrant jury determination with access to the full evidentiary record.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award the following relief under Maryland law:

a. **Compensatory and Special Damages** – For permanent neurological, cognitive, emotional, reproductive, relational, and financial harms, including the decade-long loss of reproductive autonomy, loss of earning capacity, and the costs of care and support for Plaintiff's child.

b. **Statutory and Punitive Damages** – For Defendant's deceptive practices, material omissions, and reckless disregard of foreseeable risks, pursuant to Maryland tort law and the Maryland Consumer Protection Act, including punitive damages as warranted under *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420 (1992).

c. **Damages for Loss of Bodily Integrity and Reproductive Autonomy** – Including compensation for the inability to refuse unwanted medical intervention and for the continuing deprivation of reproductive choice.

d. **Continuing Harm and Tolling** – A declaration that Plaintiff's injuries constitute a continuing tort, with limitations tolled so long as degrading fragments remain embedded, together with damages and equitable relief for ongoing harms caused by retained fragments, MRI foreclosure, and irretrievability.

e. **Medical Monitoring and Corrective Disclosures** – Court-supervised medical monitoring for Plaintiff, her child, and similarly situated patients, including neurological, neurodevelopmental, and toxicological evaluation services, along with corrective safety disclosures to patients and providers.

f.  **Declaratory Relief** – A declaration that Defendant's conduct violated Maryland common-law duties to warn, disclose material risks, and obtain informed consent; that these duties run in parallel to applicable federal requirements; and that Defendant's conduct further violated Plaintiff's rights to bodily integrity and reproductive autonomy.

g.  **Injunctive Relief** – Requiring Defendant to:

(i) cease describing the device as "reversible" or "removable" without disclosing degradation risks;

(ii) issue corrective safety notices;

(iii) establish patient-support programs; and

(iv) submit to oversight by an independent compliance monitor to ensure full disclosure of device degradation risks in labeling, marketing, and physician materials.

h.  **Spoliation Sanctions** – Appropriate relief under Fed. R. Civ. P. 37(e) for the loss of critical evidence.

i.  **Costs and Attorneys' Fees** – As permitted by statute or common law.

j.  Prejudgment and Post-judgment Interest – As permitted by law.

k.  **Such Other and Further Relief as the Court Deems Just and Proper** – Including recognition of Plaintiff's continuing diagnostic obstruction, unresolved toxic exposure, and the systemic need for accountability.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all issues so triable. Plaintiff further seeks full factual and expert

discovery into material degradation, labeling evolution, informed consent practices, and postmarket risk communications relevant to the claims asserted herein.

## JUDICIAL FRAMING (PRO SE)

My entire adult life has been defined by absence; of candor, of warnings, of truth. I have been poked, prodded, tested, scanned, and worn down by a system that could not diagnose what it was never told to see. I write this in the first person because I am not a lawyer and have no formal training in how to draft a lawsuit. I do not know the mechanics of legal pleading, but I know what was withheld, and no conventional phrasing can capture the lived reality of that concealment.

I submit this Complaint because I have no alternative. I became my own counsel not out of choice, but out of necessity. I read books, cases, and regulatory texts; I studied the decisions of those I thought worthy of emulation. I bought law programs and accessibility programs, searching for language to describe what I already knew was there but couldn't put into words. I spoke with doctors, caregivers, patients, medical and legal experts, and regulators. What I uncovered was not ignorance but omission; information so poorly disseminated that even skilled physicians lacked the basic tools to recognize what was happening. That absence of knowledge left me with nowhere else to turn, because when medicine falls silent, the law becomes the last forum where the human condition must find its voice.

That voice begins here, in this Complaint. I write as a Plaintiff and as a mother, carrying the burden of unanswered harm. My doctors cannot undo what was concealed; my child cannot undo what was inherited. The law exists for this purpose: to weigh what was owed against what was denied, and to decide whether consent obtained without truth is consent in any meaningful sense. If nondisclosure is permitted to stand as consent, then consent itself has no meaning.

This case is not just about chemistry. It is about candor. It is about whether Maryland's most basic legal principles—disclosure, informed consent, and the right to refuse hidden risks—still carry force in the age of neural implants.

For more than forty years Maryland law has held that consent without disclosure of material risks is no consent. *Sard v. Hardy*, 281 Md. 432 (1977). It has imposed duties to warn of hazards, *Doe v. Miles Labs.*, 927 F.2d 187 (4th Cir. 1991), and to protect unborn children from foreseeable harm, *ACandS v. Asner*, 344 Md. 155 (1996). As *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990), confirmed, the right to refuse unwanted medical intervention is meaningless if the most dangerous hazards are revealed only after intervention is complete. These duties predate the FDCA and are echoed by the Supreme Court's recognition in *Wyeth v. Levine*, 555 U.S. 555 (2009), that state law continues to demand candor when risks are reasonably knowable.

And for more than forty years Defendant has confronted the same lesson. The Sprint Fidelis lead fractures, the Infuse bone graft controversy, the SynchroMed consent decree, and decades of polyurethane advisories each built a reputation for withholding risks until harm was undeniable. Securities fraud suits, whistleblower testimony, and international investigations confirmed that concealment was not incidental but systemic. My story does not stand alone; it reflects a pattern in which Defendant withheld critical truths about device failure, patient injury, and toxic material risk until some kind of external force compelled disclosure.

The device at issue entered the market in 2003 under a Humanitarian Device Exemption (HDE), a pathway that permits marketing for rare conditions without proof of effectiveness and without validation of long-term safety. Congress struck a bargain: where proof is waived, vigilance must be heightened. That bargain collapses when candor is withheld. To allow

preemption here would not protect patients; it would turn a humanitarian exemption into a humanitarian trap.

From the outset, Defendant promoted the system as *"reversible," "removable,"* and preserving *"future therapy options."* What was known (but never disclosed) was that its insulation materials were prone to degradation. That omission was decisive. Once the barrier failed, the consequences were inevitable: fragments embedding permanently in brain tissue; byproducts leaching into neural pathways; uncontrolled current spread from exposed conductors; and the permanent loss of MRI—the only reliable tool to detect and monitor the very injuries the device itself created.

Elsewhere, the same compounds were restricted in children's products, flagged with pregnancy warnings, and removed from consumer goods. Yet here, they were implanted in the brain without disclosure, without monitoring, and without any plan for removal. The FDA required warnings acknowledging the risk, but Defendant confined those warnings to patient manuals sealed inside the device packaging with no reciprocal for doctors. Patients may or may not read such materials, and no physician could be expected to treat a sealed, post-implant insert intended for patients as a substitute for preoperative disclosure. By the time those materials were opened, the implant was already in place and meaningful consent was no longer possible. The result was inevitable: I was deprived of informed choice, my doctors were left unprepared, and when harm came, I bore the injury while they bore the blame.

At 21, I stood at the crossroads of two protections: the adult right to know and the pediatric right to oversight. Defendant denied me both. Consent was not consent, because it was stripped of disclosure, stripped of safeguards, and stripped of truth. I was never told that saying "yes" once meant surrendering my right to say "no" for the rest of my life. I was never told this

could one day make pregnancy unsafe, diagnosis impossible, and harm unavoidable. I was never told it could erode my memory, language, and focus; strip away my earning capacity; destabilize my family; and leave me to raise my child while fighting a body in decline. And I was never told that each day would bring the uncertainty of hidden damage I cannot measure or prevent. This is not the law's definition of consent; it is its undoing.

You cannot diagnose what you are never told to look for, and you cannot measure what the system itself makes impossible to see. If physicians are never warned that leads can degrade, and there is no data on what happens when it does, then of course the medical record will remain silent. Not because no harm occurred, but because no one was trained to recognize it. Defendant cannot both conceal foreseeable hazards and then argue there is "no data." Absence of data is not proof of safety; it is the predictable result of a warning never given.

Defendant knew its device could degrade, and chose silence. I sought answers, raised concerns, and followed every proper channel. Time and again, I was denied, dismissed, or told nothing was wrong. I put pen to paper and put the evidence directly before their entire leadership team. They admitted the warnings had been withheld because disclosure would affect the market — and then, they did nothing. That is not ignorance; it is willful disregard for patient safety. And when I refused to accept silence in place of disclosure, those admissions disappeared, and the company returned to the same concealment that has defined my care from the beginning.

One clear warning—one *honest* phrase —would have preserved my right to choose. That warning was never given. The law does not demand perfect proof; it demands candor when dangers are reasonably knowable. Instead, what was promised as reversible proved irreversible. This was not a mistake that can be corrected or a lapse that can be excused. It was a fundamental

failure—of the product, of the oversight, of the entire system of protections that should have stood between a patient and irreversible harm.

The proof of that failure is not hidden in my life, my family, or my genetics. It lies in the uniform testimony of my caregivers. Depose them all. Line up every doctor, every specialist, every caregiver who has ever touched my case. Each one will testify to the same absence of disclosure. And when that record is complete, the only question left will be why a company would place a device in the human brain knowing it could fall apart and never tell anyone.

This case presents multiple, overlapping modes of failure, each independently plausible and already corroborated by the public record. Even before discovery, the surgical findings, FDA approval filings, HDE documentation, decades of scientific literature, MAUDE entries, prior FDA safety alerts, and Defendant's own patents and admissions establish that the device could disintegrate. Defendant may demand more data, more tests, or more examinations, but each will only circle back to the same truth and compound the same injury.

There is nothing left to take. Every safeguard has collapsed, every right has been denied, and every meaningful choice has been stripped away. I have no tools left but this Court. The price of silence has already been paid, by a mother and her child. The question is whether that silence will be permitted to stand as consent, or whether it will finally be answered.

**Respectfully submitted,**

*Katie Merkle*

Katie Merkle
Plaintiff, Pro Se
706 Hunting Place
Baltimore, MD 21229
(410) 925-7510
merkle.katie@comcast.net
Dated: November 14, 2025