IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| KATIE MERKLE, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-25-3737 |
| MEDTRONIC, INC., | * | |
| Defendant. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Katie Merkle ("Plaintiff"), who is self-represented, filed this twelve-count products liability action against Defendant Medtronic, Inc. ("Medtronic"), alleging claims suffered from the implantation of a medical device, an Activa Deep Brain Stimulation ("DBS") system. ECF 1. Without filing the motion required by Federal Rule of Civil Procedure 15(d), Plaintiff also filed a twenty-five page "supplement" to her complaint, asserting six additional counts. ECF 10. Medtronic has filed a motion to dismiss the complaint, citing preemption and failure to state a claim. ECF 21. Plaintiff opposed the motion, ECF 23, and Medtronic filed a reply, ECF 24. Plaintiff also filed a motion for leave to file a surreply, ECF 25, which will be granted. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated below, Medtronic's motion to dismiss will be granted and the complaint will be dismissed without prejudice.

## I.    FACTUAL BACKGROUND

The facts described herein are derived from Plaintiff's Complaint, ECF 1, and are taken as true for purposes of this motion.[1] In childhood, Plaintiff was diagnosed with Myoclonus-Dystonia,

---

[1] Plaintiff's Complaint, in its totality including her "supplement," well exceeds one hundred pages and would be subject to dismissal for that reason alone. This Court will not dismiss on that

a genetic condition caused by dysfunction within the basal ganglia in the brain. *Id.* ¶¶ 8, 10. Dystonia is considered non-degenerative, so while it causes involuntary muscle contractions, repetitive twisting movements, and abnormal postures, it generally does not progress or cause ongoing neurological decline. *Id.* ¶ 8.

Among other medical devices, Medtronic manufactures and sells an Activa DBS system consisting of three primary components "(1) an intracranial electrode lead (Model 3387), (2) a subcutaneous extension wire, and (3) an implantable pulse generator (IPG) placed in the chest wall." *Id.* ¶ 12. Once the system is implanted, the IPG delivers electrical stimulation to the brain through the leads and is designed to be replaced periodically as its battery life expires. *Id.*

The DBS's lead and extension wire contains materials including platinum-iridium electrode contacts, a polyurethane body, and a fluoropolymer sheath to insulate the materials from the body and prevent spread into brain tissue. *Id.* ¶¶ 13, 14. Medtronic marketed its DBS device as a "reversible" and "removable" alternative to surgical treatment options. *Id.* ¶ 16. In fact, however, since the 1980s and 1990s, Medtronic knew that safety alerts had issued for its cardiac pacing leads because of failure of the same family of polyurethane insulation. *Id.* ¶ 18. Internal manufacturer documents, also available to the public, indicate that some of the materials used in the DBS leads degrade into neurotoxins and carcinogens. *Id.* ¶ 19. And polyurethane degradation itself can result in substances that are carcinogens, toxicants, endocrine disruptors, and neurotoxicants. *Id.* ¶¶ 20-21. The complaint summarizes that "[t]aken together, polyurethane breakdown, fluoropolymer

---

basis in light of Plaintiff's self-represented status. This factual summary includes the most salient facts but not all of the facts contained therein. This Court notes that Plaintiff's stated alternative purpose of creating "a forensic, medical, and moral account of what was hidden, what was denied, and what must not be repeated," ECF 1 at 4, probably hindered her ability to provide what court rules demand: a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Any proposed amended complaint will be held to that standard, in addition to the page limitation set forth in the Local Rules.

delamination, and platinum corrosion reflect a convergence of possible failure modes that were scientifically foreseeable, but never quantified, monitored, or disclosed." *Id.* ¶ 24.

By 2005, the Food and Drug Administration ("FDA") had authorized Medtronic's Activa DBS device for dystonia under a Humanitarian Device Exemption ("HDE"). *Id.* ¶ 30. Under that pathway, following investigation, the FDA permits marketing of a device for rare conditions "based on 'probable benefit,' without proof of long-term effectiveness or validation of material durability." *Id.* That year, Plaintiff was implanted with the Activa device. *Id.* Once the device was implanted, because of its component parts, MRI was contraindicated and could not be used in Plaintiff for diagnostic purposes. *Id.* ¶ 67. The disclosures accompanying implantation gave physicians "general reassurances of material safety alongside limited caveats, without a plain acknowledgement that physical deterioration of the lead was a foreseeable failure mode." *Id.* ¶ 39. And as for the patient manual, it was enclosed in a sealed kit with the implantable device, meaning that a plaintiff had no opportunity to review the manual before the device was removed from the packaging for implantation. *Id.* ¶ 41. "Buried in fine print" in the patient manual, however, it read, "Over time there is some risk that the lead could break down. If this would happen the breakdown materials are known to cause nerve damage or cancer in animals. The chance of these effects occurring in patients is not yet known." *Id.* ¶ 43. Plaintiff asserts that the available physician manual "made no mention" of possible degradation. *Id.*

Plaintiff's health began deteriorating in 2011–2012, with "subtle but progressive neurological changes." *Id.* ¶ 59. In subsequent years, she noted "unexplained side effects" from her intermittent use of her implanted DBS device. *Id.* ¶ 60. During her pregnancy in 2014, a use of her device was followed by "an acute neurological episode consistent with a cortical insult." *Id.* ¶ 62. She could not obtain imaging to investigate a precise cause of her symptoms because MRI

could not be used due to her implanted device and CT scanning could not be used due to her pregnancy. *Id.*

Plaintiff stopped using her DBS stimulator in 2017 due to the side effects she experienced every time she used it. *Id.* ¶ 63. Her "systemic decline progressed" during this window, but her medical providers "never directly connected her worsening condition to the implant." *Id.* ¶ 65. In or around 2019–2020, Plaintiff's doctors discussed elective removal of the DBS device, but the procedure was deferred due to the COVID-19 pandemic. *Id.* ¶ 66.

Plaintiff underwent explant surgery in 2022. *Id.* ¶ 68. During that procedure, her physicians discovered that the coating on the right intracranial lead had completely disintegrated, and the lead itself fractured during removal, leaving some of the platinum-iridium conductor embedded in Plaintiff's cortical tissue and bone. *Id.* ¶ 70. The retained fragments and breakdown byproducts in Plaintiff's body continue to render the use of MRI unsafe. *Id.* ¶ 68.

Despite evidence of the known risks, "[t]he first documented regulatory request for a neurotoxicity or carcinogenicity study did not appear until a 2008 post-approval order." *Id.* ¶ 26. More recent manufacturer labeling for the DBS device indicates an "expected implant lifetime of approximately five years, and identifies polyurethane and platinum-iridium as the materials to which patients may be exposed." *Id.* ¶ 29. No such disclosures were made at the time of Plaintiff's surgery." *Id.*

On November 22, 2025, the FDA expanded the indications for the Activa to include full pre-market approval ("PMA") for dystonia. ECF 10 ¶ 1. Plaintiff asserts that "FDA does not appear to have reviewed any long-term toxicology data" before expanding the indications and that appropriate studies either were not done or not provided to the FDA. *Id.* ¶¶ 2, 5.

## II.    LEGAL STANDARDS

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a

5

complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Because Plaintiff is self-represented, her pleadings are "liberally construed" and "held to less stringent standards than [those filed] by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "However, liberal construction does not absolve Plaintiff from pleading a plausible claim." *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014), *aff'd*, 584 F. App'x 135 (4th Cir. 2014); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. DKC-10-3517, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011)

6

("[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim."), *aff'd*, 526 F. App'x 255 (4th Cir. 2013).

Moreover, a federal court may not act as an advocate for a self-represented litigant. *See Brock v. Carroll*, 107 F.3d 241, 242–43 (4th Cir. 1997) (Luttig, J., concurring in judgment); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). Therefore, the court cannot "conjure up questions never squarely presented," or fashion claims for a self-represented plaintiff. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985); *see also M.D. v. Sch. Bd. of Richmond*, 560 F. App'x 199, 203 n.4 (4th Cir. 2014) (unpublished) (rejecting self-represented plaintiff's argument that district court erred in failing to consider an Equal Protection claim, because plaintiff failed to allege it in the complaint).

## III. ANALYSIS

### A. Preemption

The federal Food Drug and Cosmetic Act ("FDCA") includes the Medical Device Amendments ("MDAs") that classify medical devices into three categories. The categories range from Class I devices, which present no unreasonable risk of illness or injury and are subject to minimal regulation, to Class III devices, which either "present[] a potential unreasonable risk of illness or injury" or are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." 21 U.S.C. § 360c(a)(1)(C). Class III devices are only approved for marketing after they are subjected to a rigorous PMA process by the FDA. *Id.* In that process, the FDA weighs "any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." *Id.* § 360c(a)(2)(C). On average, the FDA spends 1,200 hours reviewing information about the safety and efficacy of each Class III device, granting PMA "only if it finds there is a 'reasonable

assurance' of the device's 'safety and effectiveness.'" *Reigel v. Medtronic, Inc.*, 552 U.S. 312, 318 (2008) (quoting 21 U.S.C. § 360e(d)). Once the FDA awards PMA for a device, the manufacturer is prohibited under federal law from making "changes in design specifications, manufacturing processes, labeling, or any other attribute that would affect safety or effectiveness" without obtaining FDA approval. *Id.* at 319. Manufacturers have ongoing duties to report adverse incidents to the FDA and to "periodically inform the FDA about data from clinical studies or scientific literature related to the device." *Walker v. Medtronic, Inc.*, 670 F.3d 569, 574 (4th Cir. 2012). The Activa DBS device received PMA approval for Parkinson's Disease in 1997. ECF 1 ¶ 26.

As described above, the FDA also authorizes a less stringent form of pre-market approval under the HDE. HDE approval is reserved for devices treating or diagnosing a condition affecting fewer than 8,000 individuals in the United States per year. 21 U.S.C. § 360j(m)(2). While the FDA still performs extensive safety evaluation of the device, HDE approval does not require a demonstration, such as through clinical trials, of the device's effectiveness at treating the condition. *Id.* Courts have held that devices approved under an HDE are treated the same, for preemption purposes, as those receiving traditional PMA because they remain subject to strict FDA requirements. *See Sundaramurthy v. Abbott Vascular, Inc.*, 594 F. Supp. 3d 117, 122 (D. Mass. 2022); *Brandt v. Medtronic, Inc.*, 179 F. Supp. 3d 963, 967 & n.2 (D. Nev. 2016) ("[T]here is no dispute that the . . . Device was subjected to a PMA process, albeit through an HDE . . . . [*Riegel*] explicitly referenced an HDE device as an example of a device subject to FDA's premarket approval process."). For example, the HDE granted to the Activa for dystonia required Medtronic to submit "copies of the approved labeling in final printed form." ECF 21-5 at 1.

The FDCA's statutory scheme contains two preemption provisions relevant to this case. Congress specified that any action "for the enforcement, or to restrain violations" of the FDCA

must be brought "by and in the name of the United States." 21 U.S.C. § 337(a). And the MDA provides that no state may impose "any requirement" regarding the safety or effectiveness of a medical device "different from, or in addition to, any requirement applicable . . . to the device" under federal law. 21 U.S.C. § 360k(a)(1). Together, those two statutory provisions preempt "nearly all types of claims concerning FDA-approved medical devices." *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 592 F. Supp. 2d 1147, 1161 (D. Minn. 2009).

The Supreme Court, however, has carved out a narrow path for some plaintiffs' state-law claims against device manufacturers to proceed. *Riegal*, 552 U.S. at 330. To bring viable claims against Class III medical device manufacturers, plaintiffs must assert state-law claims that are parallel to federal law. *Id.* A parallel claim is one that does not impose requirements different from those imposed on the manufacturers by federal law. *Id.* Essentially, then, to state a claim, a plaintiff must meet both prongs of a two-prong test: (1) the plaintiff must allege that the manufacturer failed to comply with a specific federal requirement applicable to the device, and (2) the plaintiff must explain how that violation of the federal requirement also violated a provision of state law, since the FDCA forbids a plaintiff from advancing a private claim for violation of the FDCA. *Ellis v. Smith & Nephew, Inc.*, C/A No. 6:15-545-TMC, 2016 WL 7319397, at *3 (D.S.C. Feb. 16, 2016).

The Supreme Court has also made clear that plaintiffs cannot bring private claims amounting to an assertion of "fraud on the FDA." In *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 348 (2001), the Supreme Court held that the "plaintiffs' state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law." The conflict is that "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives." *Id.* Similarly, the FDA retains control over monitoring

and managing postapproval requirements, because 21 C.F.R. § 814.82(c) provides that "[f]ailure to comply with any postapproval requirement constitutes a ground for withdrawal of approval of a PMA." Those requirements, too, are not properly the subject of private claims for enforcement.

In sum, where a PMA (or, by extension, HDE) device "was designed, manufactured, and distributed in compliance with the terms of the FDA's premarket approval," claims against the device are preempted. *Walker*, 670 F.3d at 578. Deviation from FDA requirements is a necessary (but not sufficient) component of a viable claim.

### B. Plaintiff's Claims

In total, Plaintiff's Complaint and Supplement set forth eighteen counts, as set forth below:

1. Strict Liability/Negligence – Failure to Warn
2. Fraudulent Concealment/Misrepresentation
3. Breach of Express Warranty
4. Prenatal and Developmental Injury (Damages Pled in the Alternative Under Counts I–III)
5. Maryland Consumer Protection Act
6. Punitive Damages
7. Negligent Design (Parallel; Plead in the Alternative to Counts I–II)
8. Strict Liability Design (Parallel: Pled in the Alternative)
9. Misbranding/False or Misleading Labeling
10. Failure to Report Adverse Events
11. Failure to Update Labeling with Newly Acquired Information
12. Negligent Training and Failure to Educate Physicians
13. Negligent Misrepresentation and Fraud by Omission
14. Misbranding Under Federal and State Parallel Duties
15. Breach of Implied Warranty of Safety and Fitness
16. Gross Negligence/Reckless Disregard for Patient Safety
17. Failure to Report Adverse Events to FDA and IRBs
18. Failure to Submit Required PMA Information

Initially, two of the "counts" (in Counts Four and Six) describe damages theories, not separate legal claims. Those "counts" will therefore be dismissed. With respect to the remaining claims, because of the substantial overlap and the two prongs that must be met to escape preemption, this Court will address them in clusters.

The overarching problem, however, lies in a disconnect between Plaintiff's "core theory" of her case and the allegations in her complaint.[2] She asserts that her concern is over Medtronic's "voluntary assurances, as conveyed to physicians and patients" about the device's attributes. ECF 23 at 7. But her Complaint does not specify any such assurances or how those communications were made to her or her physician in a manner she relied upon to her detriment. Plaintiff's only allegation of a "private" or "direct" communication to her occurred in a call with a Medtronic "representative" in 2025, about 20 years after her device was implanted, ECF 1 ¶ 53(b), and well after it was explanted in 2022. Anything said in that 2025 communication did not harm Plaintiff – the harm she alleges had already occurred. She attaches to her Complaint excerpts appearing to be from a website, ECF 1-5, which purports to depict Medtronic's website from various dates spanning 2008–2025. But her allegations do not clarify when she (or her physician) reviewed that website or relied on its representations in making her treatment decisions. Plaintiff's DBS device was implanted in 2005, and her Complaint describes a period of assurances made "[f]rom the first mention of Dystonia on Defendant's website in 2008 onward." ECF 1 ¶ 92. Any such representations, then, could not have affected Plaintiff's decision to have the device implanted in the first instance. Her allegations about characterizations made "[b]etween 2002 and 2005," *id.* ¶ 156, are all made by "authoritative sources" other than Medtronic itself. She alleges, in her Complaint and her surreply, that her "neurosurgeon relied on Defendant's representations during the 2005 implant counseling and conveyed those assurances to Plaintiff and her family." ECF 1 ¶ 180. But she has not explained what representations Medtronic made that her neurosurgeon relied

---

[2] To the extent Plaintiff's claims touch on the overall safety of the device, they are expressly preempted by the MDA, which puts decisions about the safety and (where appropriate) effectiveness of medical devices under the purview of the FDA. § 360k(a)(2).

upon in counseling her about treatment options.[3] Subsequently chronicling all publicly available representations made about the Medtronic device is unhelpful in providing a "short and plain" statement of Plaintiff's particular claim.

Additionally, the Complaint does not clearly explain how Medtronic's alleged public-facing statements violated FDA-approved labeling requirements. Liberally construing the Complaint's allegations in Plaintiff's favor, as this Court must, this Court reads her argument to be that while the FDA-approved labeling and manuals contained both (1) statements about the removability, reversibility, and preservation of treatment options with the DBS and (2) warnings about the possible degradation or toxicity of its component parts, Medtronic's marketing of the DBS outside of its formal labeling omitted those warnings, making the positives sound more certain and uncontroverted. Without, at this point, having been provided with the FDA-approved labeling for the device or any specific Medtronic statements Plaintiff relied upon, it is plausible that such allegations could "thread the needle" to state a non-preempted claim for misrepresentation under Maryland law.

But because of the generalizations used throughout the Complaint, Plaintiff has not threaded the needle and this Court is unable to determine whether she can do so. In other words, she has not identified any statements made by Medtronic "to private parties" that violated the FDA's requirements, also violated state law, and caused injury to her because she or her physician saw them or relied upon them. Plaintiff specifies that she is not seeking damages "for noncompliance with federal reporting or labeling duties." ECF 23 at 9. But she fails to recognize that she has to identify a fact-based violation of the FDA's requirements to sustain her claims

---

[3] She also alleges that "[r]eliance recurred" in both 2014–16 and 2020–22 but again does not allege what Medtronic statements or representations were relied upon and by whom. *Id.*

against a preemption challenge. Her allegation that the approved labeling and manuals constitute a "misleading net impression," *id.* at 7, is, inherently, a challenge to the FDA's approved labeling requirements. She must provide a clearer picture of other statements made by Medtronic at other times and the ways in which those statements differed from the FDA-approved requirements. *See, e.g.*, *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011) ("Plaintiffs cannot simply incant the magic words '[Appellees] violated FDA regulations' in order to avoid preemption.") (alteration in original) (quoting *In re Medtronic, Inc.*, 592 F. Supp. 2d at 1158); *Funk v. Stryker Corp.*, 631 F.3d 777, 782 (5th Cir. 2011) (affirming dismissal of complaint that failed to allege "how the manufacturing process failed, or how it deviated from the FDA approved manufacturing process"). And she cannot simply rely on the lore or reputation that the device gained in the medical community. Plaintiff must offer a viable factual basis for her claims, premised on Medtronic's own actions and statements, in order to proceed to discovery. *See In re Kunstler*, 914 F.2d 505, 516 (4th Cir. 1990) ("The need for discovery to complete the factual basis for alleged claims is not an excuse to allege claims with no factual basis.").

Thus, while Plaintiff might be able to amend her complaint to state a non-preempted claim relating to Medtronic's marketing of the DBS, she has not done so in this iteration. Each cluster of claims is addressed below:

### 1. Failure to Warn/Misrepresentation/Labeling/Design Claims (Counts I, II, III, V, VII, VIII, IX, XI, XIII, XIV)

As Plaintiff concedes, "the gravamen" of her Complaint "is that Defendant affirmatively marketed its DBS device as reversible, removable, and preserving future options in a decision-critical context and thereby conveyed a materially misleading half-truth by omission." ECF 23 at 6. At least nine of Plaintiff's claims focus on these alleged representations by Medtronic in its labeling and marketing materials, and the alleged omission of contrary information in the form of

warnings. Even in Plaintiff's nominally design-related claims in Counts VII and VIII, she alleges that she is not demanding a "safer design" but simply contending that Medtronic failed to disclose "foreseeable consequences of its chosen design." ECF 1 ¶¶ 217, 224. Essentially, despite their different labels, these claims all sound in misrepresentation and failure to warn.

The labeling accompanying a device is established and approved during the PMA or HDE process. *See* 21 C.F.R. § 814.80. At times, Plaintiff's Complaint suggests an argument that the FDA approved and permitted Medtronic's labeling of its DBS device when it should not have done so, in light of readily available medical studies and materials. Such allegations, while understandable given Plaintiff's unfortunate experience with her device, do not circumvent the problem of federal preemption mandated by Congress and the Supreme Court. In her Complaint, Plaintiff has not alleged sufficient facts to suggest that any of Medtronic's labeling violated the federal requirements that the FDA put in place for the DBS device. Additionally, as set forth above, Plaintiff has not precisely set forth how Medtronic's marketing (outside of its labeling) deviated from the language in the FDA-approved label. In the absence of facts sufficient to state a plausible parallel claim, then, Plaintiff's existing claims are preempted as described in *Riegel* and must be dismissed without prejudice.

### 2.   Reporting Requirements (Counts X, XVII, XVIII)

Plaintiff also asserts a series of failures by Medtronic to report information to the FDA at various points in time. Because these reporting duties are owed only to the FDA, Plaintiff cannot enforce those requirements of the MDA under *Buckman. See Chiapello v. Corin USA Ltd., Co.*, Civ. No. SAG-23-3149, 2024 WL 3548726, at *5 (D. Md. July 23, 2024) ("[R]eporting duties are owed only to FDA, and Plaintiff cannot enforce those requirements of the MDA under *Buckman*."); *Ellis*, 2016 WL 7319397, at *7 (reasoning that claim resting on failure to provide

reports to FDA was impliedly preempted); *Dawson v. Medtronic, Inc.*, C/A No. 3:13-cv-663-JFA, 2013 WL 4048850, at *7 (D.S.C. Aug. 9, 2013) (claims based on violations of regulations relating to "information that manufacturers are required to provide to the FDA . . . would clearly be impliedly preempted"). To the extent these reporting requirements would establish some duty owed to Plaintiff, Plaintiff has neither identified the duty existing under state law nor alleged any facts to substantiate a violation of any such duty. *See Simmons v. Bos. Sci. Corp.*, No. CV 12-7962 PA (FFMx), 2013 WL 1207421, at *5 (C.D. Cal. Mar. 25, 2013) (finding a complaint preempted where it "merely baldly asserts that Defendants failed to report adverse events" and ruling that the "unsupported allegations, without more, are insufficient [to] state a claim under *Twombly*").

### 3. Negligent Training/Failure to Educate Physicians (Count XII)

Plaintiff's negligent training count fails to provide the factual premise required by *Twombly*, in that it is devoid of any specific allegations about what the FDA-required physician training requires or, importantly for preemption purposes, how Medtronic's training deviated from the FDA's requirements. Once again, Plaintiff appears to premise her claim on what she alleges to be an overall lack of adequate *warning* to her physician about the risk of degradation, not a deficiency in Medtronic's training itself. Her negligent training claim, therefore, must be dismissed as preempted and for failure to state a claim.

### 4. Claims relating to PMA Process (Counts XIV–XVI)

Finally, Plaintiff asserts a series of claims relating to the 2025 PMA approval of the Activa DBS. In addition to some reiteration of the warning-based claims described above, these claims focus on what she believes to be a lack of safety testing of the device. First, as part of her "misbranding" claim in Count XIV, she alleges that "FDA's publicly available regulatory record . . . contains no evidence that FDA ever reviewed long-term material stability, degradation,

15

particulate migration, toxicology, reproductive or fetal risks, or the clinical consequences of lead disintegration." ECF 10 ¶ 29. Plaintiff alleges that the omission resulted in false or misleading labeling.

In Count XV, she alleges that "the absence of long-term safety validation in any PMA record confirms that the device was not fit for permanent implantation or safe for decades-long intracranial use," *id.* ¶ 33, which lead to "implied warranties of long-term safety, biostability, removability, and suitability for permanent implantation" *id.* ¶ 35. And in Count XVI, she asserts a gross negligence claim, suggesting that Defendant was grossly negligent by not providing sufficient information relating to long term studies and adverse reporting to the FDA.

Those claims constitute either complaints about the thoroughness of the FDA's safety evaluation process, which would be preempted, or a "fraud-on-the-FDA" theory suggesting that Medtronic withheld relevant information from the FDA, which would also be preempted under *Buckman*. The claims are therefore subject to dismissal.

## IV.    CONCLUSION

For the reasons set forth above, Medtronic's Motion to Dismiss, ECF 21, is GRANTED, Plaintiff's motion to file a surreply, ECF 25, is GRANTED, and Plaintiff's claims are dismissed without prejudice. A separate Order follows, which will close the case, subject to reopening should Plaintiff file a motion for leave to amend her claims within sixty days. Any such motion must be accompanied by a proposed amended complaint that fulfills the requirements of Federal Rule of Civil Procedure 8(a) and Local Rule 103.1(d) (limiting a pleading to no more than forty pages). The case will be reopened if such a motion is timely filed.

Dated:  May 15, 2026                              _____/s/_____
                                                              Stephanie A. Gallagher
                                                              United States District Judge

16